CAPITAL SALES, INC.,[1] PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 829–77—832–77.    Filed December 27, 1978.

*William S. Duke,* for the petitioners.
*Thomas R. Thomas,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax for the years and in the amounts as follows:

| Petitioners | FYE | Deficiencies |
| --- | --- | --- |
| Capital Sales, Inc .............. | Sept. 30, 1973 | $2,960.83 |
| Joseph and Jonnie H. Simon | Dec. 31, 1974 | 4,175.00 |
| Warner L. and Hazel Mathis | Dec. 31, 1974 | 13,267.00 |
| John M. Beard, Jr ............ | Dec. 31, 1974 | 4,621.00 |

---

[1]Cases of the following petitioners are consolidated herewith: Joseph Simon and Jonnie H. Simon, docket No. 830–77; Warner L. Mathis and Hazel Mathis, docket No. 831–77; John M. Beard, Jr., docket No. 832–77.

The issues for decision are:

(1) Whether transactions between Capital Sales, Inc., and Southern Sash Supply Co., both of which were corporations owned by the same shareholders, constituted a reorganization under section 368(a)(1)(D), I.R.C. 1954,[2] so that distributions to the shareholders of Capital Sales, Inc., represented dividend income rather than capital gain income of shareholders upon liquidation of Capital Sales, Inc.;

(2) If the distributions represented dividend income, whether the earnings and profits of Capital Sales, Inc., were sufficient to cover the entire distributions and, if not, whether the earnings and profits of Southern Sash Supply Co. should also be considered in determining whether the distributions should be treated as a dividend; and

(3) Whether Capital Sales, Inc., was availed of during its fiscal year ended September 30, 1973, for the purpose of avoiding income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being distributed, thereby becoming liable for the tax imposed by section 531.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Capital Sales, Inc. (Sales), a corporation organized in 1960 under the laws of Alabama with its principal office in Montgomery, Ala., at the time of the filing of the petition in this case, filed its Federal corporate income tax return for its fiscal year ending September 30, 1973, with the District Director of Internal Revenue, Birmingham, Ala.

Joseph Simon and Jonnie H. Simon, husband and wife, who resided in Montgomery, Ala., at the time of the filing of their petition in this case, filed their joint Federal income tax return for the calendar year 1974 with the Internal Revenue Service Center, Chamblee, Ga.

Warner L. Mathis and Hazel Mathis, husband and wife, who resided in Montgomery, Ala., at the time of the filing of their petition in this case, filed their joint Federal income tax return

---

[2]All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

for the calendar year 1974 with the Internal Revenue Service Center, Chamblee, Ga.

John M. Beard, Jr., who resided in Montgomery, Ala., at the time of the filing of his petition in this case, filed a joint Federal income tax return with his wife, Virginia P. Beard, for the calendar year 1974 with the Internal Revenue Service Center, Chamblee, Ga.

Sales was organized in 1960 for the purpose of engaging in the buying, selling, manufacturing, and generally dealing in all kinds of property. The powers vested in it by its corporate charter were broad. However, on January 9, 1961, the corporate charter was changed to show as the corporate purpose the "carrying on [of] a general contracting business and to furnish materials therefor."

Southern Sash Supply Co. (Supply) of Montgomery, Ala., was incorporated on May 1, 1963, under the laws of Alabama for the purpose of engaging in the building materials, supplies, and specialty items business.

Southern Sash Contracts, Inc. (Contracts), of Montgomery, Ala., was incorporated on September 3, 1968, under the laws of Alabama for the purpose of contracting. The purpose as stated in its charter was to "contract for, furnish and install building materials, supplies and specialty items."

Prior to and during the periods involved in these cases, Sales, Supply, and Contracts all shared common office space and common shop and warehouse space in Montgomery, Ala. The president, the vice president, and the secretary-treasurer of each of these corporations were Warner L. Mathis, John M. Beard, Jr., and Joseph Simon, respectively. The following shows the shareholders and number of shares held by such shareholders in each of these corporations:

|  | Percentage of ownership | | |
|  | Supply | Sales | Contract |
|---|---|---|---|
| Mr. and Mrs. Mathis | 79.0 | 72.22 | 50 |
| Mr. Beard | 9.5 | 11.11 | 25 |
| Mr. Simon | 9.5 | 11.11 | 25 |
| Others | 2.0 | 5.56 | 0 |
| Total | 100.0 | 100.00 | 100 |

Each of these corporations kept its books on a fiscal year basis. The following schedule shows the total assets, gross receipts,

taxable income, officers' salaries, and retained earnings of each
of these corporations for its fiscal year ending in 1973:

|                      | Supply      | Sales     | Contract  |
|----------------------|-------------|-----------|-----------|
| Total assets         | $1,244,387  | $132,813  | $225,673  |
| Gross receipts       | 2,988,151   | 125,337   | 384,430   |
| Taxable income       | 194,458     | 17,050    | 30,136    |
| Officers' salaries   | 266,618     | 24,000    | 36,000    |
| Retained earnings    | 764,885     | 121,637   | ---       |

Shortly after its formation, Sales became a distributor of
Modernfold doors which at that time were manufactured by
New Castle Products, Inc., of New Castle, Ind. At the time Sales
obtained its franchise to distribute Modernfold doors, it was the
policy of New Castle Products, Inc., to have as distributors small
or relatively small companies that would handle Modernfold
doors as their primary product. In 1963 a company named
Southern Sash of Montgomery was liquidated and Messrs.
Mathis, Simon, and Beard, who were the shareholders of Sales,
decided to purchase its assets. Because of the nature and size of
the business being acquired and the desire to keep the
Modernfold account in a small business, Messrs. Mathis, Simon,
and Beard decided to form a separate corporation to take over
the business purchased from Southern Sash of Montgomery.
They therefore formed Supply to take over the assets and
business of Southern Sash of Montgomery.

During its early years of operation, Sales added some products
besides Modernfold doors to its line, but its primary function was
and continued to be to promote the sale of the folding doors and
special doors of New Castle Products, Inc. Sales was engaged
primarily in selling materials for large buildings, particularly
those constructed to a large extent from glass and aluminum.
The Modernfold door contracts handled by Sales were relatively
small, but the contracts handled by Supply were much larger
contracts. By the beginning of its fiscal year 1972, over 80
percent of Sales' business was distributing Modernfold doors.
The business of Supply was much more diversified.

On January 31, 1968, New Castle Products, Inc., and Sales
entered into an agreement which provided that Sales would be a
distributor of certain products, including all parts, replacement
parts, and supplies necessary for the installation and operation
thereof, manufactured by New Castle Products, Inc. These

products carried various names but were basically all some type of folding door. Under the agreement, Sales was to be the exclusive distributor of these products in 20 counties in south central Alabama. The agreement generally set forth the duties of the manufacturer to furnish the products and a warranty on the products, and the distributor to use its best efforts to make sales of the products and to meet the sales goal of the manufacturer. It further provided:

10. This agreement is not assignable, nor does it constitute Distributor as the agent or representative of the Manufacturer for any purpose except as set out herein.

11. This agreement may be terminated by the Manufacturer without notice and without liability to the Distributor for any material violation of this agreement by Distributor. The agreement may be terminated by either party without cause and without liability to the other party, subject to the conditions of this paragraph:

(a) Notice of termination shall be given in writing thirty (30) days prior to the effective date of termination.

(b) All accounts or other indebtedness owed by the terminating party shall become immediately due and payable. Accounts or indebtedness owed by the terminated party shall become due and payable in the usual course of business.

(c) The Manufacturer shall have the right to buy all or any part of Distributor's products, parts, replacement parts or supplies previously purchased from the Manufacturer, at the current net distributor prices.

This agreement cancels and supersedes all prior agreements between the parties dealing with the products covered in this agreement, constitutes the entire agreement between the parties, is executed at New Castle, Indiana, and shall be construed under the laws of the State of Indiana.

Sometime after the date of the agreement between New Castle Products, Inc., and Sales, New Castle Products, Inc., was purchased by American-Standard Co. After American-Standard Co. acquired New Castle Products, Inc., it began to manufacture much larger and more expensive items than the Modernfold doors handled by Sales, such as movable walls. Some of the contracts for installation of such movable walls would run from $150,000 to $200,000 and on some occasions up to $500,000.

For its fiscal year ending September 30, 1972, Sales sustained a loss of over $6,000. In late 1972 or early 1973, Mr. Simon, the treasurer and comptroller of Sales, talked with Mr. Mathis about this situation and pointed out to him that Sales might well lose its franchise for Modernfold doors since the company manufacturing those doors had been taken over by American-Standard and more expensive products had come into the line. The

comptroller suggested to Mr. Mathis that it might be well to liquidate Sales. Although Mr. Mathis was aware that American-Standard preferred larger companies as distributors of its products and that the possibility existed that Sales might lose its distributorship, he decided at the time the comptroller talked to him not to liquidate Sales. Sales was the first company which Mr. Mathis had owned. He felt it had taken a long time to build up the company, even though it was not a big company. He felt that the company could serve a useful purpose if it could retain the Modernfold distributorship or could go out and get other accounts. The company was unsuccessful in getting other accounts.

In late 1973, Mr. Gilmore, who was a salesman for Sales handling the Modernfold account, told Mr. Mathis that he had been informed by officials of American-Standard that the Modernfold account was going to be shifted to another distributor. Mr. Gilmore stated to Mr. Mathis that during his conversation it had been suggested that perhaps Supply could take over the account.

Sometime after this conversation, Mr. Gilmore reported to Mr. Mathis that he believed American-Standard would transfer the Modernfold door distributorship to Supply. After receiving this information, Mr. Mathis talked with Mr. Simon about the liquidation of Sales. Mr. Mathis was of the opinion that under any circumstances Sales would lose the distributorship of Modernfold doors and that it was better to have the distributorship transferred to Supply than lost to an unrelated company. Since Sales' major product was the Modernfold doors, Mr. Mathis told Mr. Simon that under the circumstances he saw no purpose to be served in not liquidating Sales and that he agreed with him that Sales should be liquidated.

In the early part of December, the sales representative of American-Standard handling the Modernfold account requested the company's sales manager to transfer the Modernfold account to Supply. Under date of December 18, 1973, a letter was sent on stationery entitled "Modernfold, An American-Standard Company" to Sales, signed by American-Standard's Modernfold credit manager, which read as follows:

Effective December 31, 1973, we are changing our records to show Southern Sash Supply of Montgomery, Inc. as the distributor but we will not change the distributor number that has been assigned to you.

We thank you for the copy of your October 31, 1972 financial statement and we respectfully request a copy of the October 31, 1973 statement when it becomes available.

Instructions are being issued to bill all shipments after December 31 to Southern Sash Supply of Montgomery, Inc.

On January 7, 1974, a joint meeting of the stockholders and board of directors of Sales was held. At this meeting it was pointed out that in previous discussions it had been decided unanimously by all directors and stockholders that Sales should be liquidated. The chairman of the meeting, Mr. Mathis, as president of the corporation, proposed to the directors and stockholders that the corporation sell all its assets other than cash on hand and in banks, certificates of deposit, and investment in common stocks and that the president and secretary be authorized to carry out such sale. A resolution to this effect was passed unanimously. Pursuant to the corporate resolution of January 7, Sales sold the following assets to Supply on January 10, 1974:

| | |
|---|---|
| Accounts receivable | $28,331.87 |
| Notes receivable | 17,000.00 |
| 1971 Pontiac stationwagon | 488.28 |
| Stock of Contract, Glass & Metal Co | 2,000.00 |
| Note due from Contract, Glass & Metal Co | 2,500.00 |
| Outstanding Modernfold door orders | 5,880.64 |

All of the assets, except the Modernfold door orders, were sold to Supply at book value to Sales. Modernfold door orders were sold at 50 percent of the estimated gross profit expected by Sales had Sales continued to service the orders.

Mr. Mathis, as president of Sales, was of the opinion that a going concern could better collect accounts receivable and notes receivable than could a dissolved corporation and it was for this reason that he recommended the sale of the accounts and notes receivable by Sales.

Sales was dissolved on January 31, 1974, but continues to exist as a body corporate for 5 years after such dissolution for the purpose of prosecuting and defending suits. Sometime in late 1973, Mr. Gilmore, who had handled the Modernfold account for

Sales, became employed by Supply as a salesman of Modernfold products. After its dissolution in 1974, Sales distributed cash in the amount of $111,786.84 and stocks of a value of $23,864 to its shareholders in liquidation. The amount distributed to each of the shareholders is as follows:

| Name of shareholder | Percentage ownership | Amount of distribution |
|---|---|---|
| W. L. Mathis | 66.67 | $90,433.89 |
| Hazel Mathis | 5.55 | 7,536.15 |
| J. M. Beard | 11.11 | 15,072.32 |
| Joseph Simon | 11.11 | 15,072.32 |
| T. B. Hill III | 5.56 | 7,536.16 |
| | | 135,650.84 |

Among the assets owned by Sales on September 30, 1973, was a certificate of deposit in the amount of $50,000.

The following schedule shows the retained earnings and increase in retained earnings of Sales for its taxable years ended September 30, 1969, to September 30, 1973:

| Sept. 30— | Increase in retained earnings | Retained earnings |
|---|---|---|
| 1969 | $11,582.74 | $103,042.05 |
| 1970 | 13,172.07 | 116,214.12 |
| 1971 | 10,065.50 | 126,279.62 |
| 1972 | (6,789.00) | 119,491.00 |
| 1973 | 2,146.14 | 121,637.14 |

No dividend was ever paid by Sales. The balance sheets of Sales for the periods ended September 30, 1966, through September 30, 1973, are shown on pp. 424–427.

For their calendar year 1973, Mr. and Mrs. Mathis had taxable income of $143,631 and paid Federal income tax of $64,437.

Respondent, pursuant to the provisions of section 534(b), sent by certified mail on June 23, 1976, a notification informing Sales that a proposed statutory notice of deficiency included an amount with respect to accumulated earnings tax imposed by

## CAPITAL SALES, INC.

Comparative Balance Sheet
For the Years Ended Sept. 30, 1966, 1967, and 1968

|  | 1966 | | 1967 | | 1968 | |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash ......................................... | | $24,379.55 | | $18,353.30 | | $25,956.99 |
| Accounts receivable—trade ................ | | 103,139.23 | | 82,917.48 | | 72,497.37 |
| Other investments—stocks ................. | | 9,849.00 | | 16,228.10 | | 16,228.10 |
| Buildings and other fixed | | | | | | |
| depreciable assets ........... | $5,740.45 | | $5,740.45 | | $5,590.45 | |
| Less accumulated depreciation | 3,314.81 | 2,425.64 | 4,617.49 | 1,122.96 | 4,964.60 | 625.85 |
| Other assets ................................ | | 425.00 | | 425.00 | | 425.00 |
| Total assets .............................. | | 140,218.42 | | 119,046.84 | | 115,733.31 |
| **LIABILITIES AND CAPITAL** | | | | | | |
| *Liabilities:* | | | | | | |
| Accounts payable .......................... | | 64,641.52 | | 28,760.09 | | 12,899.70 |
| Other current liabilities —taxes ......... | | 10,224.33 | | 9,312.17 | | 6,924.15 |
| *Stockholders' equity:* | | | | | | |
| Common stock ............................. | | 1,000.00 | | 1,000.00 | | 1,000.00 |
| Paid-in surplus ............................ | | --- | | 3,750.15 | | 3,750.15 |
| Retained earnings ......................... | | 64,452.57 | | 76,524.43 | | 91,459.31 |
| Less cost of treasury stock .............. | | (100.00) | | (300.00) | | (300.00) |
| Total liabilities and capital ............. | | 119,046.84 | | 140,218.42 | | 115,733.31 |

## CAPITAL SALES, INC.

Comparative Balance Sheet
For the Years Ended Sept. 30, 1969 and 1970

| | 1969 | | 1970 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| *Current assets:* | | | | |
| Cash | | | | |
| Cash in banks .............. | $20,548.75 | | $24,342.03 | |
| Petty cash fund ............ | 25.00 | $20,573.75 | 25.00 | $24,367.03 |
| Accounts receivable—trade ................ | 73,137.81 | | 101,720.61 | |
| Accounts receivable—other ................ | 150.00 | | 150.00 | |
| Notes receivable ............................ | 20,450.00 | | 17,450.00 | |
| Commissions receivable .................... | 3,000.00 | | --- | |
| Total current assets .................................... | | $117,311.56 | | $143,687.64 |
| *Investments (at cost):* | | | | |
| 20 shares Poundstone Auto Parts, Inc .. | 2,000.00 | | 2,000.00 | |
| 100 shares American Preferred | | | | |
| Insurance Co ............................. | 500.00 | | 500.00 | |
| 327 shares Union Bank & Trust Co ...... | 13,728.10 | | 13,728.10 | |
| 100 shares Contract Glass & Metal, Inc .. | --- | | 2,000.00 | |
| Total investments ..................................... | | 16,228.10 | | 18,228.10 |
| *Fixed assets:* | | | | |
| Cost of fixed assets ........................ | 5,590.45 | | 5,590.45 | |
| Less accumulated depreciation ............ | 5,083.28 | | 5,152.27 | |
| Book value of fixed assets ........................... | | 507.17 | | 438.18 |
| *Other assets:* | | | | |
| Deposit on credit cards—Delta Air Lines .............. | | 425.00 | | 425.00 |
| Total assets ........................................... | | 134,471.83 | | 162,778.92 |
| **LIABILITIES AND CAPITAL** | | | | |
| *Current liabilities:* | | | | |
| Accounts payable—trade ................... | 20,478.00 | | 37,146.00 | |
| Accrued taxes ............................. | 2,305.02 | | --- | |
| Accrued and withheld payroll taxes ...... | --- | | 443.87 | |
| Provision for corporation income taxes .. | 4,196.61 | | 4,524.78 | |
| Total current liabilities ................................. | | 26,979.63 | | 42,114.65 |
| *Capital:* | | | | |
| Capital stock (200 shares, | | | | |
| $10 par common authorized; | | | | |
| 100 shares issued) .......... | 1,000.00 | | 1,000.00 | |
| Paid-in surplus (from sale | | | | |
| of treasury stock) .......... | 3,750.15 | | 3,750.15 | |
| Retained earnings ........... | 103,042.05 | 107,792.20 | 116,214.12 | 120,964.27 |
| Less treasury stock (10 shares at cost) .. | 300.00 | | 300.00 | |
| Total capital ........................................... | | 107,492.20 | | 120,664.27 |
| Total liabilities and capital ........................... | | 134,471.83 | | 162,778.92 |

## CAPITAL SALES, INC.

Comparative Balance Sheet
For the Years Ended Sept. 30, 1971 and 1972

| | 1971 | | 1972 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| *Current assets:* | | | | |
| Cash | | | | |
| Cash in banks .............. $46,971.69 | | $48,630 | | |
| Petty cash fund ............ 25.00 | $46,996.69 | 25 | $48,655 | |
| Accounts receivable—trade ................ | 48,057.67 | | 24,159 | |
| Accounts receivable—other ................ | 150.00 | | 379 | |
| Commissions receivable .................... | 2,802.90 | | --- | |
| Notes receivable ........................... | 19,950.00 | | 25,950 | |
| Accrued interest receivable ................ | 625.00 | | --- | |
| Claim for refund—Federal income tax ... | --- | | 2,322 | |
| Total current assets ................................... | | $118,582.26 | | $101,465 |
| *Investments (at cost):* | | | | |
| 20 shares Poundstone Auto Parts, Inc. .. | 2,000.00 | | 2,000 | |
| 100 shares American Preferred | | | | |
| Insurance Co ............................. | 500.00 | | 500 | |
| 327 shares Union Bank & Trust Co ...... | 13,728.10 | | 13,728 | |
| 100 shares Contract Glass | | | | |
| & Metal, Inc .............................. | 2,000.00 | | 2,000 | |
| 200 shares Capitol National Bank ........ | 2,912.00 | | 2,912 | |
| Total investments ...................................... | | 21,140.10 | | 21,140 |
| *Fixed assets:* | | | | |
| Cost of fixed assets ......................... | 8,171.46 | | 8,171 | |
| Less accumulated depreciation ............ | 3,556.12 | | 6,530 | |
| Book value of fixed assets ........................... | | 4,615.34 | | 1,641 |
| *Other assets:* | | | | |
| Deposit on credit cards—Delta Air Lines .............. | | 425.00 | | 425 |
| Total assets ........................................... | | 144,762.70 | | 124,671 |
| **LIABILITIES AND CAPITAL** | | | | |
| *Current liabilities:* | | | | |
| Accounts payable—trade .................... | 8,134.47 | | --- | |
| Accounts payable—Hill and Flurry ....... | --- | | 360 | |
| Sales tax payable .......................... | 1,616.48 | | 370 | |
| Provision for corporation income taxes .. | 4,281.98 | | --- | |
| Total current liabilities ................................ | | 14,032.93 | | 730 |
| *Capital:* | | | | |
| Capital stock (200 shares, $10 | | | | |
| par common authorized | | | | |
| 100 shares issued) ......... 1,000.00 | | 1,000 | | |
| Paid-in surplus (from sale | | | | |
| of treasury stock) ......... 3,750.15 | | 3,750 | | |
| Retained earnings .......... 126,279.62 | 131,029.77 | 119,491 | 124,241 | |
| Less treasury stock (10 shares at cost) .. | 300.00 | | 300 | |
| Total capital ........................................... | | 130,729.77 | | 123,941 |
| Total liabilities and capital .................... ....... | | 144,762.70 | | 124,671 |

CAPITAL SALES, INC.

Balance Sheet
For the Year Ended Sept. 30, 1973

|  |  | *1973* |
|---|---|---|
| ASSETS | | |
| *Current assets:* | | |
| Cash on hand and in bank .............................. | $12,588.26 | |
| Certificate of deposit ..................................... | 50,000.00 | |
| Accounts receivable—trade .............................. | 27,004.95 | |
| Notes receivable (including interest) ................... | 4,428.56 | |
| Prepaid expenses and deposits .......................... | 575.00 | $94,596.77 |
| *Investments:* | | |
| Common stocks (at cost—market $22,000) .......................... | | 18,228.10 |
| *Equipment:* | | |
| Automobile ................................................. | 6,084.79 | |
| Office equipment .......................................... | 2,086.67 | |
|  | 8,171.46 | |
| Allowance for depreciation .............................. | 7,683.18 | 488.28 |
| *Other assets:* | | |
| Notes receivable—stockholders and others ......................... | | 19,500.00 |
|  | | 132,813.15 |
| LIABILITIES | | |
| *Current liabilities:* | | |
| Accounts payable ......................................... | 449.92 | |
| Sales taxes ................................................. | 324.19 | |
| Income taxes payable ..................................... | 5,850.14 | 6,624.25 |
| *Stockholders' equity:* | | |
| Common stock—par value $10.00; issued 100 shares ..................................................... | 1,000.00 | |
| Paid-in surplus (no change during year) ............. | 3,750.15 | |
| Retained earnings ......................................... | 121,738.75 | |
|  | 126,488.90 | |
| Less treasury stock, 10 shares (at cost) .............. | 300.00 | 126,188.90 |
|  | | 132,813.15 |

section 531 for its fiscal year ended September 30, 1973. Pursuant to section 534, Sales timely submitted on August 11, 1976, a statement of grounds upon which it relies to establish that all or part of earnings and profits for the taxable period ended September 30, 1973, have not been permitted to accumulate beyond the reasonable needs of its business. In this statement, Sales listed the following grounds:

(1) The need to improve the financial condition to meet requirement of its principal supplier, Modernfold;

(2) The need to expand its product line;

(3) The need to increase investment and inventory; and

(4) The need to keep cash on hand for current needs such as carrying large accounts receivable when the corporation attained a sizable job.

Respondent, in his notices of deficiency to the Mathises, the Simons, and the Beards determined that the amounts they received from Sales were received in connection with a reorganization under section 368(a)(1)(D) and therefore constituted ordinary dividend income rather than capital gain. Respondent adjusted the incomes of the Mathises, the Simons, and the Beards accordingly.

In his notice of deficiency to Sales, respondent determined that Sales was formed or availed of for the purpose of avoiding income tax with respect to its shareholders by permitting its earnings and profits to accumulate instead of being divided or distributed during its fiscal year ended September 30, 1973. In the notice, respondent noted that consideration had been given to the statement dated August 9, 1976, in response to notification sent on June 23, 1976, pursuant to section 534(b), but that it had been determined that the information set forth was not sufficient to establish that any part of its earnings and profits for its fiscal year ended September 30, 1973, was retained for the reasonable needs of its business.

## OPINION

Petitioners contend that they received the cash and stocks from Sales in complete liquidation of the corporation and that under section 331(a) the amounts they received from Sales should be treated as having been received in full payment in exchange for their Sales stock, thereby resulting in capital gains to them. Respondent takes the position that the various

transactions, including the transfer of assets to Supply and the distribution by Sales to petitioners were interdependent steps in a transaction which, when viewed in its entirety, constitutes a corporate reorganization as that term is defined in section 368(a)(1)(D).[3] Respondent further asserts that the amounts distributed by Sales to petitioners are taxable as dividends to the extent of the undistributed earnings and profits of both Sales and Supply.

Under section 368(a)(1)(D), the term "reorganization" includes a transfer by a corporation of all or part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders, is in control of the corporation to which the assets were transferred. Further, the statute requires that stock of the corporation to which the assets were transferred must be distributed in a transaction qualifying under sections 354, 355, or 356. In this case, the relevant provision governing the qualified status of the stock distribution is section 354(b)(1)(A).[4] This section provides for nonrecognition of gain or loss upon the exchange of stock in a reorganization as

---

[3]SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.
(a) REORGANIZATION.—
(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

\* \* \* \* \* \* \*

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

[4]SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.
(a) GENERAL RULE.—
(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.
(2) LIMITATION.—Paragraph (1) shall not apply if—
(A) the principal amount of any such securities received exceeds the principal amount of any such securities surrendered, or
(B) any such securities are received and no such securities are surrendered.

\* \* \* \* \* \* \*

(b) EXCEPTION.—
(1) IN GENERAL.—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless—
(A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and
(B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.

defined in section 368(a)(1)(D) provided that the corporation to which the assets are transferred acquires "substantially all" the assets of the transferor and that the stock and properties received by the transferor are distributed in pursuance of the plan of reorganization.

For Federal tax purposes, a corporate transfer of assets to another corporation controlled by the shareholders of the transferor followed by a liquidation of the transferor corporation may be characterized as a reorganization, if the sum total of these transactions results in the continuity of business operations under a modified corporate form with a continuity of shareholder investment in the enterprise, the very essence of a "D" reorganization. See, e.g., *Davant v. Commissioner*, 366 F.2d 874 (5th Cir. 1966), affg. on this point 43 T.C. 540 (1965); *Atlas Tool Co. v. Commissioner*, 70 T.C. 86 (1978).

Respondent contends that in this case all the requisites of a "D" reorganization have been met. He points out that Supply received virtually all of the operating assets of Sales, and that a transfer of operating assets has been held to meet the requirement of section 354(b)(1)(A) that "substantially all" the assets be acquired by the transferee corporation. *Wilson v. Commissioner*, 46 T.C. 334, 345 (1966); *Moffat v. Commissioner*, 42 T.C. 558, 578 (1964), affd. 363 F.2d 262 (9th Cir. 1966), cert. denied 386 U.S. 1016 (1967). Respondent states that even though there was not literal compliance with the section 368(a)(1)(D) requirement that stock or securities be distributed, the distribution requirement was nevertheless met since petitioners controlled over 90 percent of the stock of both Sales and Supply, and the proportionate interests each held in both corporations were substantially identical. Respondent relies on cases holding that literal compliance with the distribution requirement is not required, since the statutory requirement may be satisfied without an actual distribution. *Wilson v. Commissioner, supra* at 344; *James Armour, Inc. v. Commissioner*, 43 T.C. 295, 307 (1964).

There is, however, in this case a vital fact that distinguishes it from the typical case in which a transfer of assets followed by a liquidation is reclassified as a "D" reorganization. In this case, literally speaking, there was no transfer by Sales of its principal operating asset, the Modernfold franchise. In fact, there could be no literal transfer of the Modernfold franchise, as it was by its

terms nonassignable. The facts disclose that Sales' Modernfold franchise was terminated and subsequently granted to Supply. However, American-Standard, not Sales, was responsible for this course of action. Consequently, whether or not we characterize these transactions as a "D" reorganization will turn on whether the cancellation by American-Standard of the Modernfold franchise followed closely by a reissuance of the franchise to Supply can properly be termed a "transfer" by Sales.

Neither party has squarely faced this issue. We have discovered no case with a substantially similar factual situation.[5] A somewhat similar issue was involved in *DeGroff v. Commissioner*, 54 T.C. 59 (1970), affd. 444 F.2d 1385 (10th Cir. 1971). In that case, the taxpayers were the sole shareholders in three corporations, Medco Products, Medco Manufacturing, and Medco Electronics. Medco Products (Products) and Medco Manufacturing (Manufacturing) were incorporated in 1955. Products was formed for the purpose of marketing electrical therapeutic equipment, especially an electrical muscle stimulator device known as the Medcolator, an invention of the taxpayers. Manufacturing was formed for the purpose of manufacturing the equipment marketed by Products. Subsequently, the taxpayers developed an updated therapeutic device, known as the Medco-sonolator, which combined the therapies of ultrasound and electrical stimulation. They formed Medco Electronics (Electronics) for the purpose of marketing the device. The taxpayers obtained a patent covering the Medco-sonolator, and granted to Electronics an exclusive license to make and sell the Medco-sonolator. The license agreement permitted Electronics the right to sublicense under the agreement, but with respect to the assignability of the license, the agreement recited that the agreement and license were personal to the parties. Notwithstanding these provisions in the license agreement, Manufacturing, rather than electronics, assembled the Medco-sonolator.

In 1963, in order to avoid the duplication inherent in the conduct of their business in three corporations, the taxpayers decided that Electronics should cease business and that the

---

[5] In *New York City Omnibus Corp. v. Commissioner*, a Memorandum Opinion of this Court dated May 23, 1946, we held that the taxpayer could not use the basis of a bus franchise of a predecessor company in computing depreciation where the bus franchise was granted to the new company directly by the city rather than being transferred to the taxpayer by its predecessor. However, the facts in the *New York City Omnibus Corp.* case differ substantially from the facts in the instant case.

Medco-sonolator should thereafter be marketed by Products. They transferred Electronics' accounts receivable to Products. Thereafter Products marketed the Medco-sonolator, although Electronics neither assigned its license agreement nor granted a sublicense to Products. In 1964, the taxpayers received from Electronics a net distribution of $122,296.58, which on their income tax return they reported as long-term capital gain from the liquidation of Electronics.

As he does in the case now before us, respondent took the position that the transfer of assets from Electronics to Products constituted a "D" reorganization and that the distribution received by the taxpayers was taxable as ordinary income rather than as capital gain. We held for respondent, agreeing with his contention that the transfer of assets, which we characterized as "informal," met all the requisites of sections 368(a)(1)(D) and 354(b)(1)(A). The taxpayers' primary argument against reorganization treatment was that the "substantially all" requirement of section 354(b)(1)(A) had not been met because Electronics' nonassignable exclusive license agreement to "make and sell" the Medco-sonolator had not been transferred to Products. We rejected that argument, however, refusing to take at face value the terms of an agreement which was not entered into at arm's length and which had not been intended to govern the business relationships between and among the taxpayers and their wholly owned corporations. Although there was never a formal transfer of the license agreement, we found that the sum total of the facts constituted an informal transfer, and thus a "D" reorganization.

In our view, the facts in the case now before us are meaningfully distinguishable from those in *DeGroff v. Commissioner, supra,* and considering the factual differences, the reasoning in the *DeGroff* case supports a holding that here there was not a transfer of substantially all the assets. The *DeGroff* case strongly suggests that had the license in fact been nonassignable and in fact had not been transferred to one corporation by the other, no reorganization under section 368(a)(1)(D) would have occurred. However, in *DeGroff,* the parties were not dealing at arm's length. The taxpayers granted the exclusive license to a corporation of which they were the sole shareholders. Consequently, for all practical purposes, the licensee determined its own rights under the license agreement,

and any decision with respect to the transfer of the license would be made by the same persons controlling the corporation holding the license. By contrast, Sales had no control whatever over the cancellation or transfer of its franchise agreement. Upon 30 days' notice, American-Standard could terminate the franchise agreement without cause, and the Sales shareholders had no power to determine the subsequent fate of the franchise. Moreover, the facts in *DeGroff* revealed that the parties had disregarded the nonassignability provision of the license agreement in that case so that the provision prohibiting further assignment should not be given effect. Nothing in the record in this case, however, warrants the inference that the provisions of the franchise were not realistically intended to govern the business relationship of the parties. Rather, the evidence shows that the relationship between American-Standard and Sales was arm's length, and Sales was prohibited from assigning its franchise. The reasoning in the *DeGroff* case, indicates that under such circumstances, no section 368(a)(1)(D) reorganization would occur where the license or franchise was a substantial operating asset.

Here, Sales' only significant operating asset was its Modernfold franchise. Therefore, in our view, Sales did not transfer to Supply its most significant operating asset. As heretofore pointed out by the terms of a binding agreement entered into at arm's length, Sales could not have transferred the franchise to Supply or anyone else. The evidence in this record indicates that American-Standard was not merely a conduit through which the franchise could be transferred from Sales to Supply. Compare *Lesser v. Commissioner*, 26 T.C. 306, 313 (1956). The record indicates that American-Standard dealt with the other parties at arm's length, looking after its own best interests. Moreover, Mr. Mathis, the president and majority stockholder of Sales, initially did not even want the franchise agreement revoked and transferred to Supply. He took great pride in Sales, the first company in which he held a controlling interest. The decision to terminate the Modernfold franchise was out of his hands, however. To be sure, once the decision to terminate had been made, Mr. Mathis preferred retention of the franchise by another corporation in which he held a substantial interest to a loss of the franchise to an unrelated company. Nevertheless, neither he nor the corporation could or did transfer the

Modernfold franchise to Supply. The decision to take that action rested solely with the management of American-Standard.

From our conclusion that there was no transfer by Sales of its principal operating asset, the Modernfold franchise, it follows that respondent has improperly used step transaction analysis in attempting to characterize the transaction as a "D" reorganization. As the revocation of Sales' Modernfold franchise and the issuance of the franchise to Supply were steps dictated and effectuated by American-Standard, rather than by Sales, in our view it is improper to view the series of events culminating in Sales' liquidation as interdependent steps in a reorganization. Steps will be treated as part of a single transaction where they are part of an integrated scheme. *Helvering v. Alabama Asphaltic Limestone Co.*, 315 U.S. 179, 184, 185 (1942). In determining whether a series of transactions constitute an integrated scheme, the most significant test is whether the steps are so mutually interdependent that the legal relations created in one step would have been fruitless without completion of the others. *H. B. Zachry Co. v. Commissioner*, 49 T.C. 73, 82 (1967); *American Bantam Car Co. v. Commissioner*, 11 T.C. 397, 405 (1948), affd. per curiam 177 F.2d 513 (3d Cir. 1949). In our view, this element of mutual interdependence is lacking in this case. Once American-Standard decided to terminate Sales' Modernfold franchise, Sales' fate was sealed. Bereft of the asset that generated almost all of its income, Sales had virtually no business to conduct. Sales' officers decided to liquidate the corporation and sell the remaining operating assets to Supply. In our view, these events would have transpired upon the termination of the Modernfold franchise even if American-Standard had not decided to give the franchise to Supply. In other words, each of these transactions had a significance of its own. The liquidation, although occasioned by the loss by Sales of the Modernfold franchise, was unrelated to the receipt of that franchise by Supply. The liquidation would have occurred regardless of who received the franchise when Sales lost it. In our view, in these circumstances, step transaction analysis is improper.

Accordingly, we hold that the liquidation of Sales was not an integrated step in a plan of reorganization, and that it should be given effect for tax purposes as a liquidation. In view of our conclusion that there was no section 368(a)(1)(D) reorganization,

we do not reach the issue raised by respondent with respect to whether earnings and profits of both Sales and Supply are considered in determining the amount of any dividend to the shareholders of Supply.

The second issue for our resolution is whether Sales was availed of for the purpose of avoiding income tax with respect to its shareholders by permitting its earnings and profits to accumulate beyond the reasonable needs of its business so that it is liable for the accumulated earnings tax imposed by sections 531 and 532.[6] Under section 534 in a proceeding in this Court involving an accumulated earnings tax liability, a taxpayer may shift the burden of proof with respect to this issue if it timely files a statement of grounds (together with facts in support thereof) upon which it relies to establish that earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. Sales filed such a statement in which it set forth the following grounds in support of its position that earnings and profits were not permitted to accumulate beyond the reasonable needs of its business:

1. Need to improve the Corporation's financial condition to support the requirement of its principal supplier, Modernfold.

2. Need to expand its product line from primarily Modernfold products to other related lines.

3. Increase in investment in inventory to meet demands needed by customers.

4. Keep cash on hand to meet current needs, such as carrying large amounts of Accounts Receivables when Corporation gets a sizable job.

The accompanying statement of facts sets forth no specific facts with regard to any of these purported justifications other than

---

[6]SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—

    (1) 27½ percent of the accumulated taxable income not in excess of $100,000, plus

    (2) 38½ percent of the accumulated taxable income in excess of $100,000.

SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) GENERAL RULE.—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

    (b) EXCEPTIONS.—The accumulated earnings tax imposed by section 531 shall not apply to—

        (1) a personal holding company (as defined in section 542).

        (2) a foreign personal holding company (as defined in section 552), or

        (3) a corporation exempt from tax under subchapter F (section 501 and following).

the first one. Such a broad and vague statement is not effective to shift the burden of proof to respondent. *I. A. Dress Co. v. Commissioner*, 32 T.C. 93, 100 (1959), affd. 273 F.2d 543 (2d Cir. 1960), cert. denied 363 U.S. 827 (1960). Even if we were to hold that respondent had that burden, however, we would nevertheless find that he has sustained it. Petitioners do not argue that the accumulated earnings and profits were necessary to cover Sales' anticipated costs of operation for a single business cycle. Rather, they assert that the accumulation was necessary to retain the Modernfold franchise and for purposes of expansion.

With respect to retention of the Modernfold franchise, Mr. Mathis testified that Sales could never have satisfied American-Standard's new financial requirements. Accordingly, Sales would not have been justified in retaining earnings and profits for this purpose.

With respect to Sales' purported needs to expand its product line and to increase its investment in inventory, the record discloses no evidence that Sales had any specific plans to expand its product line or to increase its investment in inventory. Sales' president, Mr. Mathis, testified that previously Sales had been unsuccessful in such an effort. In effect, he admitted that in the year here in issue no further effort to expand Sales' product lines was contemplated. Although under section 537(a)(1) the term "reasonable needs of the business" includes reasonably anticipated needs, section 1.537–1(b)(1), Income Tax Regs., provides:

(b) *Reasonable anticipated needs.* (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.

Petitioner's final asserted need for the accumulation is the need to accumulate earnings to meet current needs, such as carrying large amounts of accounts receivable when the

corporation gets a sizable job. First, the record reveals no specific plans to operate Sales so that it would be required to carry accounts receivable that would necessitate more assets than it had at the beginning of its 1973 fiscal year. The corporation's balance sheet as of October 1, 1972, the beginning of that fiscal year, shows current assets of $101,465 and current liabilities of $730. As of September 30, 1973, the end of its fiscal year, it had current assets of $94,596.77 and current liabilities of $6,624.25. In addition, Sales had $19,500 in notes due from its shareholders. These notes had not been outstanding at the beginning of the year. The record does not reveal that at any time Sales was unable to currently pay its bills. Accordingly, we find that Sales is liable for the accumulated earnings tax with respect to its taxable year ended September 30, 1973.

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

TANNENWALD, *J.*, dissenting: I disagree with the majority's conclusion that, on the facts presented herein, no reorganization occurred.

The reorganization provisions contemplate the continuation of a corporate enterprise in modified form, coupled with continuity of shareholder investment in that enterprise, while the concept of a complete liquidation presupposes the final cessation of a business at the corporate level. *See Ringwalt v. United States,* 549 F.2d 89, 91 (8th Cir. 1977); *Davant v. Commissioner,* 366 F.2d 874, 882 (5th Cir. 1966), affg. in part and revg. in part *South Texas Rice Warehouse Co. v. Commissioner,* 43 T.C. 540 (1965); *Lewis v. Commissioner,* 176 F.2d 646, 648 (1st Cir. 1949), affg. 10 T.C. 1080 (1948); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.54 (3d ed. 1971). It is well settled that the tax consequences of a corporate realignment are to be determined by reference to its overall net effect rather than the form given by the parties to any of its component parts. The situation should be considered as it existed at the beginning and the end of a series of steps. See *Davant v. Commissioner, supra* at 883; *Liddon v. Commissioner,* 230 F.2d 304, 309 (6th Cir. 1956), affg. on this point 22 T.C. 1220 (1954);

*Helvering v. Elkhorn Coal Co.,* 95 F.2d 732 (4th Cir. 1938); *Atlas Tool Co. v. Commissioner,* 70 T.C. 86, 98–99 (1978); *American Manufacturing Co. v. Commissioner,* 55 T.C. 204, 217 (1970); *Wilson v. Commissioner,* 46 T.C. 334, 347 (1966); *James Armour, Inc. v. Commissioner,* 43 T.C. 295, 305 (1964); *Grubbs v. Commissioner,* 39 T.C. 42, 49 (1962). Whether a reorganization has occurred depends upon the factual pattern which emerges from the series of events involved. See *Atlas Tool Co. v. Commissioner, supra* at 97; *DeGroff v. Commissioner,* 54 T.C. 59, 69 (1970), affd. per curiam 444 F.2d 1385 (10th Cir. 1971).

In my opinion, the facts of this case lie within the ambit of the reorganization provisions. Prior to the transactions involved herein, Sales was primarily engaged in the business of selling folding doors under a franchise from American-Standard. In the end, Sales was dissolved, but the same business continued to be operated on the same premises by a corporation (Supply) owned by substantially the same shareholders. The majority has focused on an isolated element of the whole transaction—the fact that technically only American-Standard possessed the power to transfer the franchise—and has concluded that, since Sales would have had to liquidate regardless of who received the franchise from American-Standard when Sales lost it, the step transaction analysis is inappropriate.

However, the test for applying the step transaction analysis is not necessarily keyed to a requirement that there be mutual interdependence among the various steps in an absolute or technical sense. The test is one of the relationship among the various steps in the context of viewing the transaction as a whole. See *Moffatt v. Commissioner,* 363 F.2d 262, 266 (9th Cir. 1966), affg. 42 T.C. 558 (1964); *Davant v. Commissioner, supra* at 883; *James Armour, Inc. v. Commissioner, supra* at 306.

The shift of the franchise to Supply and the liquidation of Sales were not merely coincidental. When American-Standard indicated that the franchise was to be shifted to another company, a representative of Sales proposed that Supply take it over. Thus, Sales acted in concert with American-Standard to achieve the transfer of the franchise.[1] Although the possibility of liquidating Sales had been discussed previously, no steps were

---

[1] I also note that, although the majority opinion speaks in terms of a revocation of the franchise by American-Standard, the findings of fact indicate that American-Standard's only action was the transfer of Sales' distribution number to Supply.

taken toward liquidation until January of 1974 after the transfer of the franchise had taken effect on December 31, 1973. Compare *Swanson v. United States,* 479 F.2d 539 (9th Cir. 1973), affg. 319 F. Supp. 959, 960–961 (E.D. Cal. 1970). Upon transfer of the franchise, the business of Sales was continued by Supply without interruption.

Under these circumstances, the fact that American-Standard was an independent third party, in the sense that it was not owned and controlled by the same interests as owned and controlled Sales and Supply, is a distinction without a difference. Similarly, the mere fact that Sales would, in any event, have lost the American-Standard franchise and liquidated does not prevent our holding that the interrelationship requisite to a reorganization existed among the various steps involved. To conclude otherwise would be to exalt form over substance—an approach which has been rejected by a myriad of cases too numerous to cite. Clearly, the circumstances herein do not place American-Standard in a sufficiently arm's-length status to avoid the application of the analysis articulated in *DeGroff v. Commissioner, supra,* and the conclusion that Sales transferred the American-Standard franchise to Supply. See also *Commissioner v. Morgan,* 288 F.2d 676 (3d Cir. 1961), revg. and remanding 33 T.C. 30 (1959).

In sum, the steps taken herein were sufficiently related so that, in total, they amounted to a transfer by one corporation (Sales) of substantially all of its assets to another corporation (Supply) controlled by the shareholders of the transferor, followed by a liquidation of the transferor corporation. The overall result was the "continuity of business operations under a modified corporate form with a continuity of shareholder investment in the enterprise," which is, as the majority states, "the very essence of a 'D' reorganization."

In so concluding, I do not intend to enunciate any rule of law that, in deciding whether a "D" reorganization occurred, there will always be a transfer of an asset where a franchise, license, or other similar contractual arrangement ends up in the hands of another corporation controlled by substantially the same interests as the prior holder thereof. Under other circumstances—e.g., if American-Standard had taken the franchise away from Sales and given it to an unrelated third party who had proved unsuccessful in its use and thereafter American-Standard had

given it to Supply—there might have been a sufficiently independent intervening event to justify finding that a complete liquidation of Sales, separate and apart from any reorganization, had occurred. Cf. *Kind v. Commissioner*, 54 T.C. 600 (1970). See also *Pridemark, Inc. v. Commissioner*, 345 F.2d 35 (4th Cir. 1965), revg. on this issue 42 T.C. 510 (1964).

The absence of an actual distribution of stock or securities of the transferee corporation does not preclude a finding that a "D" reorganization occurred if, when the transaction was completed, the stockholders of the old corporation retained their proprietary interest in the same business in another corporate shell. *James Armour, Inc. v. Commissioner, supra* at 307–308. See also *Atlas Tool Co. v. Commissioner, supra* at 97; *American Manufacturing Co. v. Commissioner, supra* at 221; *Davant v. Commissioner, supra* at 884–886. The owners of 94 percent of the stock of Sales already owned, in similar proportions, 98 percent of Supply. We have previously stated that the purpose of the final clause in section 368(a)(1)(D) is merely to assure that a transaction treated as a reorganization qualifies under section 354, 355, or 356. *Wilson v. Commissioner, supra* at 344.

In view of the foregoing, the distribution to the shareholders of Sales represented "boot" in a reorganization taxable as a dividend to the extent provided in section 356. Since this case is appealable to the Fifth Circuit Court of Appeals, the earnings and profits of both Supply and Sales should be counted in determining the amount to be treated as a dividend (see *Davant v. Commissioner, supra*) under the rule of *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. on other issues 445 F.2d 985 (10th Cir. 1971), although we have previously indicated our adherence to our original position that only the earnings and profits of the transferor corporation should be taken into account in such a determination. *American Manufacturing Co. v. Commissioner, supra* at 230–231.

FEATHERSTON, DAWSON, and CHABOT, *JJ.*, agree with this dissenting opinion.