ESTATE OF FRED F. LUCAS, DECEASED, DOROTHY C. LUCAS, EXECUTRIX, AND DOROTHY C. LUCAS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

SHAWNEE COAL COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5688–76, 5707–76.[1]    Filed February 20, 1979.

---

[1]These cases were consolidated for purposes of trial, briefing, and opinion.

*Herman D. Bradley, F. Clay Bailey, Jr.,* and *James Kelley,* for the petitioners.

*Richard J. Neubauer,* for the respondent.

HALL, *Judge:* Respondent determined deficiencies in petitioners' income tax as follows:

| Docket No. 5688–76 (Lucas) | | Docket No. 5707–76 (Shawnee Coal) | |
|---|---|---|---|
| Year | Tax | F.Y.E. Apr. 30— | Tax |
| 1969 | $25,260.57 | 1970 | $34,790.79 |
| 1970 | 26,997.37 | 1971 | 27,145.72 |
| 1971 | 19,742.04 | 1972 | 72,497.95 |

Concessions having been made by petitioners, the issues remaining for decision are:

(1) Whether certain "royalties" Roberts Brothers and C & S Coal paid Fred F. Lucas per ton of coal mined were in fact dividend payments to Lucas from Shawnee Coal Co., Inc.;

(2) Whether part of the amount Shawnee Coal Co., Inc., paid Roberts Brothers and C & S Coal for coal was a dividend to Lucas (rather than part of the cost of the coal) and therefore not a deductible expense;

(3) Whether, and the extent to which, Shawnee Coal Co., Inc., is liable for accumulated earnings tax for its fiscal year ended April 30, 1972.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly.

On the date the petition was filed, Dorothy C. Lucas (Dorothy) resided in Nashville, Tenn. Dorothy is a party by virtue of having filed joint returns with her husband Fred F. Lucas (Lucas) during the years in issue (said years being prior to his death) and by virtue of being executrix of his estate.

Shawnee Coal Co., Inc. (Shawnee), had its principal place of

business in Nashville, Tenn., at the time it filed its petition. Shawnee, a corporation organized under the laws of the State of Tennessee, was in the coal brokerage business and had one major customer, Louisville Gas & Electric Co., Inc. (Louisville Gas).

At all times material to this case, 75 percent of Shawnee's outstanding stock was owned by Lucas, and 25 percent was owned by Dorothy. Lucas was president of Shawnee and Dorothy was vice president.

Shawnee employs the accrual method of accounting and has adopted a fiscal year ending April 30.

## 1. *Constructive Dividends*

On February 28, 1968, Roberts Brothers (a coal mine operator)[2] entered into a lease and sublease agreement with Decola Franklin and others (the Franklins) for the purpose of mining coal on land owned or leased by the Franklins (the Franklin Mine). As consideration, Roberts Brothers agreed to pay the Franklins a royalty of 25 cents per ton of coal mined from the Franklin Mine and sold.

Two days later, on March 1, 1968, Roberts Brothers entered into a contract with Shawnee for the sale of 200,000 tons of coal per year to Shawnee at $3.15 per ton. The contract was for 5 years, subject to two conditions: (1) That Louisville Gas remain a customer of Shawnee, and (2) that coal produced and delivered by Roberts Brothers meet the specifications of Louisville Gas. Roberts Brothers had previously sold coal to Shawnee on a sporadic, noncontractual basis. The contract with Shawnee assured them of a guaranteed market.

Also, on March 1, 1968, Roberts Brothers and the Franklins canceled their February 28, 1968, agreement effective February 29, 1968. The Franklins then leased the Franklin Mine to Lucas, in his individual capacity, as of March 1, 1968. The terms were essentially the same as those in the Roberts Brothers' agreement with the Franklins.[3] At the same time, Lucas contracted to sublet the Franklin Mine to Roberts Brothers for a royalty of 50 cents per ton of coal sold and delivered by rail (rail coal) and 25

---

[2]When this lease was executed, Roberts Brothers was a partnership. On June 17, 1970, Roberts Brothers Coal Co., Inc., a corporation, succeeded to the partnership operation. The partnership and the successor corporation will hereinafter be referred to as Roberts Brothers.

[3]A paragraph was added whereby Lucas agreed to reimburse the Franklins for one-half of any $600 minimum royalty required to be paid by the Franklins on one of their leases sublet to Lucas.

cents per ton of coal sold and delivered by truck (truck coal). Roberts Brothers, as sublessee under Lucas, was to be subject to the same rights and duties imposed upon Lucas by Lucas' lease agreement with the Franklins.[4] Lucas further agreed that if Shawnee defaulted or canceled its contract with Roberts Brothers or failed to purchase at least 200,000 tons of coal from Roberts Brothers per year, then, upon written demand from Roberts Brothers, Lucas would assign its lease to Roberts Brothers directly. Roberts Brothers spent approximately $500,000 to put the Franklin Mine into operation.

On October 15, 1970, the agreement between Roberts Brothers and Lucas was modified to provide for a royalty payment to Lucas of 50 cents per ton on *all* coal mined by Roberts Brothers after November 1, 1970. That is, Lucas would receive 50 cents per ton on both rail coal and truck coal instead of 50 cents per ton of rail coal and 25 cents per ton of truck coal. Generally, the coal purchased by Shawnee was rail coal whereas Roberts Brothers' smaller volume customers purchased the truck coal. On the same day, a substitute contract between Shawnee and Roberts Brothers was executed reducing the annual required delivery to Shawnee from 200,000 to 100,000 tons and increasing the price per ton from $3.15 to $5.85. The increased price was designed to cover higher labor and other costs and the additional 25-cent-per-ton royalty Roberts Brothers would have to pay Lucas on truck coal. The reason for the reduction in the amount of coal required to be delivered annually was that Roberts Brothers' miners were being hired away by larger mines and it did not have enough miners to mine 200,000 tons per year.

On February 21, 1969, Lucas and Shawnee entered into a similarly designed set of agreements with C & S Coal Corp. (C & S). Lucas, in his individual capacity, agreed to lease 100 acres of coal-laden land from Evelyn M. Cox and others (the Coxes). The right to mine coal under said land will be referred to as the Cox lease. Lucas agreed to pay a royalty of 20 cents per ton of coal mined and sold, with a minimum royalty of $150 per month. The Cox lease provided that it could not be assigned, without the written permission of Evelyn M. Cox, to anyone other than C & S.

---

[4]The agreement specifically excepted Roberts Brothers from liability for the annual $300 royalty reimbursement that Lucas might possibly owe the Franklins.

On the same day, Shawnee and C & S entered into a contract which provided that C & S would mine and sell Shawnee at least 150,000 tons of coal annually at approximately $3.33 per ton. The terms of this contract were similar to the contract between Shawnee and Roberts Brothers, namely, that Shawnee could cancel the contract if (1) Louisville Gas discontinued purchasing coal from Shawnee or (2) the coal delivered did not meet the specifications of Louisville Gas or any other customer or consignee of Shawnee.

Also, on the same day, Lucas assigned the Cox lease to C & S for a royalty of 45 cents for each ton of coal mined and delivered by rail or truck. The assignment further provided that if Shawnee should default in its contract with C & S, Lucas would forfeit any rights to receive royalty payments and C & S would continue to enjoy the rights under the assignment agreement.

Although according to the contract C & S was to pay Lucas 45 cents per ton for both rail and truck coal mined and delivered, in actuality C & S paid 45 cents per ton of rail coal and only 20 cents per ton of truck coal. Generally, the type of coal sold to Shawnee was rail coal whereas the truck coal was sold to other customers of C & S.

On October 15, 1970, Shawnee and C & S executed a contract reducing the annual required delivery of coal to Shawnee from 150,000 to 100,000 tons and increasing the price per ton from $3.33 to $5.85.

During 1969, 1970, 1971, and the first 4 months of 1972, Roberts Brothers mined coal from the Franklin Mine and sold the coal to Shawnee and others as follows:

|  | Tons sold to Shawnee (rail coal) | Tons sold to others (truck coal) | Total tons mined and sold |
|---|---|---|---|
| 1969 | 215,748.80 | 49,421.38 | 265,170.18 |
| 1970 | 103,627.75 | 68,480.71 | 172,108.46 |
| 1971 | 77,048.10 | 64,916.33 | 141,964.43 |
| 1972 (January through April) .. | 16,223.05 | 13,785.80 | 30,008.85 |

During 1969, 1970, 1971, and the first 4 months of 1972, C & S mined coal from the Cox Mine and sold the coal to Shawnee and others as follows:

| | Tons sold to Shawnee (rail coal) | Tons sold to others (truck coal) | Total tons mined and sold |
|---|---|---|---|
| 1969 ................................. | 79,792.70 | 4,144.07 | 83,936.77 |
| 1970 ................................. | 96,985.55 | 10,092.89 | 107,078.44 |
| 1971 ................................. | 105,649.30 | 10,450.60 | 116,099.90 |
| 1972 (January through April) .. | 52,726.70 | 5,005.15 | 57,731.85 |

The amounts paid per ton for royalties, as well as amounts paid per ton for the coal mined, are summarized in the following table:

| Dates | Amount paid by Lucas to landowners | Amounts paid to Lucas for rail coal sold to Shawnee | Amounts paid to Lucas for truck coal sold to other customers | Price of coal sold to Shawnee |
|---|---|---|---|---|
| | | Franklin lease | | |
| 1/69–11/70 | 25¢/ton | 50¢/ton | 25¢/ton | $3.15 |
| 11/70–4/72 | 25¢/ton | 50¢/ton | 50¢/ton | 5.85 |
| | | Cox lease | | |
| 1/69–11/70 | 20¢/ton | 45¢/ton | 20¢/ton | 3.33 |
| 11/70–4/72 | 20¢/ton | 45¢/ton | 20¢/ton | 5.85 |

During the years in issue, Lucas reported his net income under the lease agreements (royalties received less amounts owed to the Franklins and Coxes) primarily as long-term capital gains from coal royalties. Respondent determined that the net payments constituted dividend income to Lucas received by Lucas from Shawnee through Roberts Brothers and C & S.

During the years in issue, Shawnee treated its entire payments to Roberts Brothers and C & S as the cost of purchases of coal and claimed them as business deductions on its income tax returns for fiscal years ended April 30, 1970, 1971, and 1972. Respondent determined, first, that royalties paid by Roberts Brothers in excess of 25 cents per ton constituted nondeductible dividends paid to Lucas by Shawnee through Roberts Brothers and, second, that royalties paid by C & S in excess of 20 cents per ton were likewise nondeductible dividends. Accordingly, respondent disallowed Shawnee's claimed deductions to the extent of this dividend portion.

An arm's-length royalty for the Franklin Mine was 25 cents per ton of coal mined. An arm's-length royalty for the Cox lease was 20 cents per ton of coal mined.

## 2. *Accumulated Earnings Tax*

Shawnee's contract with Louisville Gas was due to expire in 1973. At a special meeting of the board of directors held on February 11, 1971, Lucas, as chairman of Shawnee, suggested that, due to the "unsettled condition of the coal market" it would be advisable for Shawnee to diversify its business by investing in, developing, and selling real estate. During the years prior to this meeting, Lucas individually had owned and leased commercial real estate. He held some valuable, undeveloped land at an interstate interchange which he had inherited from his father and which he wanted Shawnee to develop.

After studying the possibility of investing in real estate, the board met again on April 15, 1971, and gave Lucas authority to seek appropriate commercial, industrial, or residential properties for purchase by Shawnee. As evidenced by the minutes of that meeting, Lucas was instructed "to inform the management to maintain sufficient capital in liquid form to enable the Company to take advantage of real estate investment opportunities as they become available."

On September 15, 1971, pursuant to unanimous consent of Shawnee's shareholders (Lucas and Dorothy), Shawnee's articles of incorporation were amended to permit the corporation to purchase, sell, or lease real estate. Shawnee then began to accumulate capital, but no actual investments were made prior to Lucas' death in 1973.

Shawnee's earnings and profits at the beginning of its fiscal years ended April 30, 1970, 1971, and 1972 were $156,785.29, $173,302.91, and $305,381.63, respectively. Earnings and profits for its fiscal year ended April 30, 1972, were $400,994.45. These earnings and profits were sufficient for the payment of dividends to Lucas in the amounts alleged by respondent. Disregarding the constructive dividends in issue, Shawnee has never paid a dividend.

The following is a statement of assets and liabilities of Shawnee as of April 30, 1971 and 1972:

| *Assets* | *4/30/71* | *4/30/72* |
|---|---|---|
| Cash | $356,743.45 | $158,574.47 |
| Trade notes and accounts receivable | 419,898.36 | 391,825.83 |
| Other current assets—dividends receivable | | 5,650.00 |
| Other investments—stocks | | 301,350.00 |

| | | |
|---|---|---|
| Buildings and other fixed depreciable assets | $59,046.16 | $59,615.95 |
| Less accumulated depreciation | (50,475.04) | (51,890.67) |
| Other assets—deposits | 425.00 | 425.00 |
| Total assets | 785,637.93 | 865,550.58 |

*Liabilities and stockholders' equity*

| | | |
|---|---|---|
| Accounts payable | 206,424.71 | 297,238.93 |
| Other current liabilities | 173,831.59 | 67,317.20 |
| Capital stock—common | 100,000.00 | 100,000.00 |
| Retained earnings | 305,381.63 | 400,994.45 |
| Total liabilities and stockholders' equity | 785,637.93 | 865,550.58 |

For the calendar year 1972, any ordinary income of Lucas and Dorothy in addition to the income shown on their joint Federal income tax return would be subject to tax rates of no less than 58 percent. For its fiscal year ended April 30, 1972, Shawnee's income was subject to the maximum corporate tax rate of 48 percent.

In accordance with the provisions of section 534(b),[5] on September 29, 1975, respondent sent Shawnee certified notification that a proposed notice of deficiency included the imposition of an accumulated earnings tax for the taxable year ended April 30, 1972. Pursuant to section 534(c), Shawnee submitted a statement to respondent setting forth the grounds on which it relied to establish that it had not permitted its earnings and profits to accumulate beyond the reasonable needs of. the business.

Respondent mailed his notice of deficiency to Shawnee on March 25, 1976. After determining that $18,112.48 of the earnings and profits for Shawnee's fiscal year ended April 30, 1972, was properly retained for reasonable business needs, respondent determined that Shawnee was liable for an accumulated earnings tax of $42,849.77 with respect to the remaining

---

[5]All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

$139,869.52 which respondent determined to have been accumulated unnecessarily.[6] No adjustment to taxable income was made pursuant to section 535(a) for the dividends paid deduction.

On September 13, 1977, a hearing was held pursuant to section 534 at which time it was determined that the burden of proof remained with petitioners on the issue of whether Shawnee is subject to the accumulated earnings tax for the taxable year ended April 30, 1972.

OPINION

### 1. *Constructive Dividend*

The first issue for decision is whether the net "royalty" payments received by Lucas from Roberts Brothers Coal Co. (Roberts Brothers) and C & S Coal Co. (C & S) represent royalty income or constructive dividends; the other side of the same coin is whether part of the cost of coal paid by Shawnee Coal Co., Inc. (Shawnee), to Roberts Brothers and C & S constitutes nondeductible dividend payments to Lucas rather than cost of coal paid to Roberts Brothers and C & S.

During the years in issue, Shawnee was a coal broker. As such, Shawnee bought coal from coal producers and sold the coal to its primary customer, Louisville Gas & Electric Co., Inc. (Louisville Gas). Lucas owned 75 percent of the outstanding stock of Shawnee; his wife, Dorothy, owned the remaining 25 percent.

On February 28, 1968, Roberts Brothers, a coal producer, leased property from the Franklins for the purpose of mining coal. As consideration, Roberts Brothers agreed to pay the Franklins a royalty of 25 cents per ton of coal mined and sold. Two days later this lease was canceled and a similar lease was executed between the Franklins and Lucas. There is no understandable explanation in the evidence why this first lease was canceled. Lucas agreed to the same 25-cent-per-ton royalty.

Lucas then sublet the Franklin Mine to Roberts Brothers for 50 cents per ton of "rail coal" and 25 cents per ton of "truck coal" mined and marketed. "Rail coal" was coal delivered by rail to Shawnee's customer, Louisville Gas. Other purchasers of coal

---

[6]Computation of tax:

| | |
|---|---:|
| 27½% of first $100,000 | $27,500.00 |
| 38½% of excess over $100,000 | 15,349.77 |
| Accumulated earnings tax | $42,849.77 |

from Roberts Brothers generally took delivery by truck, hence the name "truck coal." Also, on this same date, Shawnee agreed to purchase 200,000 tons of a specified quality of coal annually from Roberts Brothers at $3.15 per ton.

These agreements were later modified to give Lucas a royalty of 50 cents per ton on truck coal mined and marketed by Roberts Brothers, and to reduce the annual required coal delivery to Shawnee from 200,000 to 100,000 tons while increasing the price paid by Shawnee from $3.15 to $5.85 per ton. The reduction in coal to be mined and delivered resulted from Roberts Brothers' inability to hire enough miners to mine 200,000 tons of coal per year. The increased price was designed in part to cover the cost to Roberts Brothers of Lucas' additional royalty of 25 cents per ton on truck coal and in part to offset higher labor and other costs.

On February 21, 1969, a similar set of agreements was executed whereby: (1) Lucas leased 100 acres of coal-bearing land from the Coxes for 20 cents per ton of coal mined and sold, (2) Lucas assigned this lease to C & S, a coal producing company, for 45 cents per ton of rail coal and 20 cents per ton of truck coal mined and sold, and (3) C & S agreed to sell 150,000 tons of coal annually to Shawnee for $3.33 per ton. Again, the rail coal was sold to Shawnee for Louisville Gas, whereas truck coal was sold to C & S's other customers. On October 15, 1970, the contract between Shawnee and C & S was modified, reducing the annual required coal delivery to Shawnee from 150,000 to 100,000 tons, and increasing the price per ton from $3.33 to $5.85. We have no information concerning the reason for the contract modification.

Petitioners contend that the extra royalty payments[7] were royalty income to Lucas, and all payments made to Roberts Brothers and C & S by Shawnee were for the purchase of coal. Respondent, on the other hand, determined that the extra royalty payments were dividends to Lucas and an equal amount ostensibly paid for coal was not deductible by Shawnee.

It is well established that a taxpayer is free to arrange his

---

[7]During the years in issue, Lucas paid the Franklins 25 cents per ton of coal mined pursuant to the Franklin lease. The rights under Franklins' lease were assigned to Roberts Brothers for 50 cents per ton of rail coal and 25 cents per ton of truck coal mined and marketed. After Nov. 1, 1970, Lucas received 50 cents per ton on the truck coal. With regard to the Cox lease, Lucas paid 20 cents per ton of coal mined and received 45 cents per ton of coal mined under the lease assignment to C & S. The term "extra royalty" will be used to refer to the 25-cent net royalty that Lucas received under both sets of agreements.

financial affairs to minimize his tax liability and that the presence of tax avoidance motives will not nullify an otherwise bona fide transaction. *Estate of Stranahan v. Commissioner*, 472 F.2d 867, 869 (6th Cir. 1973). However, it is likewise well established that it is the substance of a transaction and not the form which determines its tax consequences. *Estate of Stranahan v. Commissioner, supra; Gregory v. Helvering*, 293 U.S. 465 (1935).

Petitioners here are called upon to prove that the extra royalties were reasonable royalties and that its three-way deal among Lucas, the producers (Roberts Brothers and C & S), and the purchaser (Shawnee) did not involve payment of a disguised dividend. These are factual questions and the burden of proof rests on petitioners. Unfortunately for petitioners, the record is nearly bare.

In *Merritt v. Commissioner*, 39 T.C. 257 (1962), revd. on another issue sub nom. *Paragon Jewel Coal Co. v. Commissioner*, 330 F.2d 161 (4th Cir. 1964), revd. 380 U.S. 624 (1965), we considered the question whether an extra royalty paid to the taxpayer by his wholly owned corporation in connection with the assignment to the corporation of numerous coal leases was in reality a dividend instead of a royalty. There the taxpayer had expended considerable time and money blocking-up the leases he assigned to his corporation, and he was entitled to some compensation for that reason. Moreover, some of the land owners were willing to lease only to an individual like the taxpayer (as opposed to a corporation) on whose personal financial responsibility they could rely. Taxpayer remained personally liable on such leases when he assigned them to his corporation. There was an adequate business reason for taxpayer taking the leases in his own name first and then assigning them to his corporation. If his corporation failed, the leases reverted to taxpayer and not directly to the land owners. We found in *Merritt* that the extra royalties were reasonable in part and concluded that the reasonable part was a royalty and the excess was a dividend. (39 T.C. at 269–273.)

Here, as noted above, we have no facts on which to base such a decision. Bennie Roberts testified that he thought the extra royalty Roberts Brothers paid Lucas was reasonable, but he gave no basis for his conclusory statement. It is suspect in view of the Franklins' willingness to accept a 25-cent-per-ton royalty.

In fact he admitted he didn't know what royalties others in the area were paying.[8] Finally, we have no evidence why Roberts Brothers was willing to cancel its lease with the Franklins providing for a royalty of 25 cents per ton of coal mined from the Franklin Mine, and let Lucas have the lease, and then under a sublease agree to pay Lucas 50 cents per ton for the same coal. Was this the price it had to pay to get the Shawnee contract and was it a reasonable price? Petitioners have failed to answer these questions.

In conclusion, the only evidence we have of an arm's-length royalty for the Franklin Mine is 25 cents per ton of coal mined and marketed. It was the Franklins that blocked-up the lease property. The Franklins were willing to lease it first to the Roberts Brothers and thereafter to Lucas for the same royalty. Lucas has not shown that any royalty in excess of 25 cents per ton was a reasonable royalty. We therefore uphold respondent's determination.

With regard to the C & S agreements respecting the Cox lease, we have no testimony at all. Again we do have Bennie Roberts' generalized and unsupported statement that the extra royalty was a reasonable royalty. It is, like the Franklin arrangement, suspect in view of the Coxes agreement to take 20 cents per ton. Apparently the Coxes were willing to lease to C & S—at least Lucas could assign the Cox lease only to C & S without prior approval from the Coxes. On the very day Lucas agreed to pay a 20 cent royalty to the Coxes per ton of coal mined from the Cox lease, he charged C & S 45 cents per ton for the same coal. Without any evidence to sustain the 45-cent royalty as reasonable, we must conclude that the arm's-length royalty charged by the Coxes represented a reasonable royalty, and sustain respondent's determination that Lucas' extra royalty is a dividend in disguise.

Moreover, we conclude that the facts of this case evidence the "sham" nature of the attempted characterization of the extra royalties. For the first year, the amount of "royalties" paid by Roberts Brothers generally depended on whether the purchaser was Shawnee or other parties—Roberts Brothers paid a higher royalty on the coal sold to Shawnee. When the royalties were

---

[8]Petitioners attempted to use the basis of settlement of a tax case between Roberts Brothers and respondent as proof of a reasonable royalty. The settlement figure between the parties proves nothing more than the price at which the parties were willing to discontinue litigation.

equalized, Shawnee began to pay Roberts Brothers more for coal in order to compensate Roberts Brothers for the extra royalties paid to Lucas with respect to coal sold to customers other than Shawnee.

We also note that, generally, C & S paid Lucas a "royalty" of 25 cents per ton more for coal sold to Shawnee than for coal sold to its other customers. We conclude that it is more than mere coincidence that both C & S and Roberts Brothers paid exactly 25 cents per ton "extra royalties" in sales to Shawnee. In addition, both C & S and Roberts Brothers could step into Lucas' shoes and take over the leases if Shawnee ceased its purchases. This indicates that the operators, not Lucas, were the true lessees of the coal mines. In light of these facts, we have little doubt that the extra royalties had no purpose other than to provide disguised payments to Lucas.

Respondent determined that these extra royalty payments were constructive dividend income to Lucas and nondeductible dividend payments made by Shawnee. In order to have received dividend income, Lucas must have received payments with respect to his stock in Shawnee. The intervention of a third party, the mine operators, even for legitimate business purposes, will not preclude the finding of a constructive dividend where an unreasonable royalty has been paid to Lucas by the operators who in turn sell to Lucas' controlled corporation, Shawnee. See *Neuberger v. United States,* an unreported case (D. Ore. 1968, 23 AFTR 2d 69–557, 69–1 USTC par. 9264); *Blackmon, Jr. v. United States,* an unreported case (N.D. Tex. 1968, 22 AFTR 2d 5860, 68–2 USTC par. 9655).

We have concluded that the extra royalty payments made by Roberts Brothers to Lucas were unreasonable. Petitioners have presented no evidence that these royalties were not, as respondent determined, merely a passthrough of a higher-than-reasonable price paid by Shawnee for its coal. In fact, petitioners presented no evidence of the average price per ton of rail coal during the years in issue paid by brokers with the comparable demand of Shawnee.[9] Moreover, the evidence presented supports respondent's determination that the price paid by Shawnee was increased to reflect the extra royalties. Roberts testified that the

---

[9] Although Mr. Roberts did testify that some of the truck coal was sold to others at a higher price than the $3.15 paid by Shawnee for the rail coal, he explained that the higher price was due to higher production costs resulting from low volume sales.

increased payments for coal by Shawnee beginning November 1, 1970 (when the price rose from $3.33 per ton to $5.85 per ton), included the extra royalty for coal sold to other customers. From this testimony we infer that the price paid for coal ($5.85 per ton) was higher than reasonable, since a reasonable price would presumably not include another party's unreasonable royalties. Shawnee also paid C & S the same high price.($5.85 per ton) for coal under similar circumstances.

In light of this evidence, we conclude that petitioners have failed to carry their burden of showing that the amount Shawnee paid for coal was reasonable. Cf. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. We therefore hold that the 25-cent extra royalties represented dividends taxable to Lucas and nondeductible dividend distributions by Shawnee. See *Byers v. Commissioner*, 199 F.2d 273, 275 (8th Cir. 1952), cert. denied 345 U.S. 907 (1953).

## 2. *Accumulated Earnings Tax*

The second issue for decision is whether and the extent to which Shawnee is liable for the accumulated earnings tax for its fiscal year ended April 30, 1972.

The accumulated earnings tax is imposed upon a corporation which is formed or availed of for the purpose of avoiding income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being distributed. Secs. 531 and 532. The accumulation of earnings and profits beyond the reasonable needs of the business is determinative of the purpose to avoid income tax unless the corporation proves to the contrary by a preponderance of evidence. Sec. 533(a). A credit is provided, however, against "accumulated taxable income" in the amount of "such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business," less the long-term capital gain deduction. Sec. 535(c). Shawnee's defenses against the penalty tax include its assertion that it planned to enter the real estate business and needed the funds to do so and its assertion that Shawnee's accumulations were justified (at least in part) by Federal "dividend guidelines" applicable in 1972.

In 1971, aware that Shawnee's brokerage contract with Louisville Gas (Shawnee's primary customer) was due to end in 1973, Shawnee's board of directors gave Lucas authority to seek

commercial, industrial, or residential properties for purchase. The board further directed that Shawnee maintain sufficient liquid capital to enable it to take advantage of real estate opportunities.

By the end of fiscal year 1972, Shawnee's retained earnings and profits reached $400,994.45; however, no real estate investments had been made.

Respondent contends that Shawnee's reasonable business needs for the fiscal year ended April 30, 1972, required the retention of earnings and profits of only $18,112.48 and imposed the accumulated earnings tax upon what he found to be Shawnee's accumulated taxable income (as defined in section 535), in the amount of $139,869.52. Shawnee may avoid the imposed accumulated earnings tax to the extent it can prove that the $139,869.52 it retained in excess of the $18,112.48 respondent allowed was retained for its reasonable business needs.[10] Sec. 535(c).

Section 1.537–2(c), Income Tax Regs., lists indicia of unreasonable accumulations of earnings and profits. Included in that list is:

(4) Investments in properties, or securities which are unrelated to the activities of the business of the taxpayer corporation * * *

Section 1.537–3(a) defines business of a corporation as including "any line of business which it may undertake." Thus it would be permissible under the regulations for a company in the coal brokerage business to enter an active business in the real estate field. See *Atlantic Commerce & Shipping Co. v. Commissioner*, 500 F.2d 937 (2d Cir. 1974), affg. a Memorandum Opinion of this Court.

Section 537(a)(1) specifically provides that reasonable needs of the business include "reasonably anticipated needs of the business." Section 1.537–1(b)(1), Income Tax Regs., in pertinent part states:

In order for a corporation to justify an accumulation of earnings and profits

---

[10]Respondent determined in the statutory notice that $18,112.48 was Shawnee's allowable limit of accumulations by using the *Bardahl* formula. See *Bardahl Manufacturing Corp. v. Commissioner*, 24 T.C.M. 1030, 34 P-H Memo T.C. par. 65,200 (1965). Shawnee argues that "accrued federal income tax" used in the formula must be adjusted upward to reflect additional tax if we hold against taxpayer on the constructive dividend issue, as we have. However, such adjustment was not a realistically foreseeable contingency and therefore should not be made. See *Alma Piston Co. v. Commissioner*, 35 T.C.M. 464, 483–485, 45 P-H Memo T.C. par. 76,107 (1976), affd. 579 F.2d 1000 (6th Cir. 1978).

for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. * * * Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.

In other words, a specific, definite, and feasible plan for the use of an accumulation of earnings and profits is required.

Plans to enter business have been considered to remain indefinite and vague even where a corporation examines various opportunities, consults attorneys and banks, retains investment brokers, and examines numerous investment proposals. *Atlantic Commerce & Shipping Co. v. Commissioner*, 500 F.2d at 940. It is not sufficient for the corporation to recognize a future problem and discuss possible and alternative resolutions; what is essential is a definite plan coupled with action taken toward its consummation. *Dixie, Inc. v. Commissioner*, 277 F.2d 526, 528 (2d Cir. 1960), affg. 31 T.C. 415 (1958), cert. denied 364 U.S. 827 (1960).

Likewise, formal resolutions of a corporation, standing alone, do not substantiate a corporation's objective to expand its business. *American Metal Products Corp. v. Commissioner*, 287 F.2d 860, 864 (8th Cir. 1961), affg. 34 T.C. 89 (1960). Instead, "the intention claimed must be manifested by some contemporaneous course of conduct directed toward the claimed purpose." *Smoot Sand & Gravel Corp. v. Commissioner*, 241 F.2d 197, 202 (4th Cir. 1957), affg. in part a Memorandum Opinion of this Court, cert. denied 354 U.S. 922 (1957); *Motor Fuel Carriers, Inc. v. Commissioner*, 559 F.2d 1348 (5th Cir. 1977).

We conclude that petitioners have not shown that any portion of Shawnee's accumulation in excess of the amount determined by respondent was for Shawnee's reasonable business needs insofar as those needs involve planned entry into a real estate business. The record herein as to the reasonable needs of Shawnee's business on this point is barren; it consists almost entirely of corporate minutes, change of the corporate charter, and testimony by Shawnee's secretary of the board of directors, Mr. F. Clay Bailey, Jr., with regard to Lucas' intent. Bailey testified that Lucas intended to have Shawnee develop a certain 4-acre parcel of land owned personally by Lucas. There is no

evidence in the record, however, indicating a "contemporaneous course of conduct" by the corporation which verifies Lucas' alleged intent. Merely amending the corporate charter to allow Shawnee to buy, sell, and lease property cannot be construed as a "substantial active move toward implementation." *Barrow Manufacturing Co. v. Commissioner*, 294 F.2d 79, 81 (5th Cir. 1961).

In reaching our conclusion, we rely on *Atlantic Commerce & Shipping Co. v. Commissioner, supra*. In that case, the taxpayer consulted its attorneys and took active steps such as examining real estate proposals. Nevertheless, we held (and the Second Circuit affirmed) that the taxpayer's plans for diversification were indefinite and vague. In the instant case, petitioner's position is even weaker, since we have no evidence that Shawnee even explored various investment possibilities. Accordingly, Shawnee has not, by pointing to its real estate aspirations, met the requirements of section 537 or the regulations thereunder with regard to showing that an amount in excess of $18,112.48 of its earnings and profits for fiscal year 1972 was retained for reasonable business needs.

Furthermore, petitioners have not presented us with any evidence showing tax avoidance was not one of the motives for accumulation. *United States v. Donruss Co.*, 393 U.S. 297 (1969); *GPD, Inc. v. Commissioner*, 508 F.2d 1076 (6th Cir. 1974). Shawnee never paid a dividend to its shareholders other than the constructive dividend at issue in this case. The evidence shows that if Shawnee had distributed its current earnings and profits, its sole shareholders would have paid income tax at the rate of at. least 58 percent on the amount distributed. See *Atlantic Commerce & Shipping Co. v. Commissioner*, 500 F.2d at 941. In light of the above, we conclude that, but for the impact of the dividend guidelines, discussed below, petitioner Shawnee Coal Co. has not met its burden of showing by a preponderance of evidence, that an amount in excess of $18,112.48 of its earnings and profits was retained for reasonable business needs.

Petitioners also take issue with respondent's calculation of accumulated taxable income. Accumulated taxable income is that amount upon which the accumulated earnings tax is imposed. Sec. 531. Section 535(a) generally defines accumulated taxable income as taxable income adjusted as provided in section 535(b) (which adjustments are not relevant here), and minus the

sum of the dividends paid deduction (as defined in section 561) and the accumulated earnings credit. Section 561 provides in part that the dividends paid deduction includes dividends paid during the taxable year determined pursuant to the rules of section 562. Under section 562(c) a distribution will not be considered a dividend for purposes of computing the dividends paid deduction "unless such distribution is pro rata, with no preference to any share of stock as compared with other shares of the same class." The preferential dividend rules of section 562(c) apply to constructive as well as actual distributions. *Henry Schwartz Corp. v. Commissioner*, 60 T.C. 728, 748 (1973).

In calculating the accumulated earnings tax, respondent did not allow a dividends paid deduction for the constructive dividends paid to Lucas by Shawnee during fiscal year ending April 30, 1972. Respondent contends that such dividends were "preferential dividends" as defined by section 562(c) in that only Lucas, a 75-percent shareholder, received said dividends. Petitioners contend, however, that section 562(c) concerns the personal holding company tax imposed by section 541 and not the accumulated earnings tax imposed by section 531.

A careful reading of the statutory language involved demonstrates that petitioners are clearly incorrect. The section 562 rules apply to both the accumulated earnings tax and the personal holding company tax. Secs. 535(a), 545(a), and 561(b).

We are brought, accordingly, to the final issue, the import of the dividend guidelines. Shawnee asserts as a further ground for accumulating rather than distributing earnings in its fiscal year ended April 30, 1972, the Federal dividend payment restrictions then in effect. Unless we find relief for Shawnee in these guidelines, we must sustain respondent on the accumulated earnings tax issue.

On August 15, 1971, the President issued Executive Order 11615, which prescribed a "Wage-Price freeze," halting for a 90-day period all increases in prices, salaries and wages, and rents, but not freezing dividends. This order was issued pursuant to statutory authorization contained in section 203 of the Economic Stabilization Act of 1970, portions of which, as then in effect, are set forth below:

Section 203. Presidential authority

(a) The President is authorized to issue such orders and regulations as he

deems appropriate, accompanied by a statement of reasons for such orders and regulations, to—

(1) stabilize prices, rents, wages, and salaries at levels not less than those prevailing on May 25, 1970, except that prices may be stabilized at levels below those prevailing on such date if it is necessary to eliminate windfall profits or if it is otherwise necessary to carry out the purposes of this title; and

(2) stabilize interest rates and corporate dividends and similar transfers at levels consistent with orderly economic growth.

Such orders and regulations shall provide for the making of such adjustments as may be necessary to prevent gross inequities, and shall be consistent with the standards issued pursuant to subsection (b).

(b) In carrying out the authority vested in him by subsection (a), the President shall issue standards to serve as a guide for determining levels of wages, salaries, prices, rents, interest rates, corporate dividends, and similar transfers which are consistent with the purposes of this title and orderly economic growth. * * *

Civil and criminal sanctions were provided in section 208 of the Act for violations of "any order or regulation under this title," and injunctive relief was authorized under section 209.

The Economic Stabilization Act of 1970 included no reference to the provisions of the Internal Revenue Code penalizing unreasonable accumulations of earnings. However, there seems to be no conflict between the two statutes, for it seems clear that a corporation which was prohibited by lawful Presidential order from paying out a dividend in excess of a given amount would as a matter of law have a "reasonable need of the business" to accumulate such amount as it was prohibited from paying out and therefore an accumulated earnings credit in that amount. Under section 535(c)(1)(A), an accumulated earnings credit is provided for "an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business." No need could be more reasonable than the need to comply with a duly authorized Presidential order having the force of law and backed by criminal and civil sanctions.

Petitioners' case, however, is more difficult, because the impact upon it of the Presidential order covering dividends control is murkier. While he was authorized by the statute to control all dividends, the President, in fact, exercised his powers in a less overtly restrictive manner as to dividends than as to wages and prices. In the President's address on August 15, 1971 (the date of Executive Order 11615), he called upon all

corporations, presumably including Shawnee, to freeze dividend payments, in the following words:

> I am today ordering a freeze on all prices and wages throughout the United States for a period of 90 days. In addition, I call upon corporations to extend the wage-price freeze to all dividends. [Fn. ref. omitted.]

Since Shawnee had no history of dividend payment, literal compliance with this would have precluded Shawnee from making any dividend payment at all. Pursuant to authority granted him under the Economic Stabilization Act, the President appointed the Cost of Living Council, by Executive Order No. 11615, on August 15, 1971, and vested the Cost of Living Council with authority to administer the wage-price freeze. On September 4, 1971, the Council issued the following "guideline" regarding dividends.

> To comply with the spirit and intent of the President's request in his address of August 15, 1971, dividends (cash or stock) on the common stock of corporations should remain at a rate not exceeding the effective rate declared in the most recent dividend period prior to August 15, 1971.

This "guideline" again prohibited Shawnee from paying dividends. On September 3, 1971, upon learning that six corporations had declared dividends in excess of the rate in effect August 15, 1971, the Cost of Living Council publicly dispatched the following telegrams to the allegedly offending corporations:

> It has been reported that your company has declared dividends exceeding the rate that was in effect prior to August 15, 1971. It has further been reported that you believe special circumstances caused this action to be taken. The Cost of Living Council takes a serious view of any change in dividend rates that would be inconsistent with the President's program.
>
> We request that you meet with members of the Council at 3:00 p.m. on Tuesday, September 7, 1971, in Room 800, 1717 H Street, N.W., Washington, D.C. to explain the circumstances surrounding your reported action.

Five of the six alleged offenders thereupon indicated their intent to comply. The following rebuke was publicly administered by Treasury Secretary Connally to the recalcitrant sixth offender, i.e., the Florida Telephone Corp., Ocala, Fla.:

> At a time when each one of us is expected to support the President's efforts * * * it is disheartening to experience this demonstration of recalcitrance, particularly from a public utility. * * *

At this point, perhaps because the dividend controls constituted "guidelines" rather than "a freeze," no further punitive action appears to have been taken.

On September 14, 1971, Dividend Guideline No. 2 was issued as follows:

> To comply with the spirit and intent of the President's request to hold the line on dividends, a company that has, as an established practice, either declared extra dividends at a particular time of year, or followed a pattern of variation in dividends throughout the year, may increase its dividends according to its past practice. The extra dividends, or the level of dividends declared in a fixed pattern, must not exceed those declared last year. An "established practice" is defined as one that has been followed during each of the past three years. Further, the practices must be documented on request.
>
> The Cost of Living Council has also emphasized that it will continue actively to scrutinize and monitor dividends declared by companies.

On September 30, 1971, Dividend Guideline No. 3 was issued, further defining terms used in the previous guideline. An exception was made for real estate investment trusts and regulated investment companies, which were required to increase dividends to maintain their qualification under sub-chapter M (see Code secs. 852(a)(1) and 857(a)(1)), but only to the extent so required, i.e., 90 percent of certain types of income. No such exception was provided for accumulations which would otherwise have been deemed unreasonable under section 531, et seq.

Although the Cost of Living Council had first issued a "guideline" and on September 4 disclaimed a "freeze" on dividends, the Commerce Department on October 7, 1971, referred to a dividend "freeze." The following telegram was sent on that date to 1,250 large corporations:

> In addition to freezing wages and prices for 90 days, * * * the President's August 15 message called upon corporations to extend the wage/price freeze to all dividends (rates). This is interpreted to mean that the dividend rate shall not exceed that for the most recent dividend period prior to August 15. I would appreciate a telegram confirming your willingness to comply with the dividend (rate) freeze.

Unanimous compliance of all 1,250 firms was reportedly obtained.

On October 15, 1971, the President established, by Executive Order No. 11627, the Committee on Interest and Dividends. This Committee was given "the responsibility of formulating and executing a program of voluntary restraints on interest rates and dividends, subject to review by the Cost of Living Council." On November 2, 1971, the Committee issued the following release:

The Committee on Interest and Dividends has announced the general principle that corporations should observe in paying dividends after January 1, 1972.

Corporations are requested to limit any increase in total dividends per share paid in 1972 to an amount not exceeding 4 percent. The base to which this increase will be applied is the total amount per share (adjusted for stock dividends and splits) paid in any of a corporation's fiscal years ending during 1969, 1970 or 1971.

Guidelines specifying coverage, exemptions, and other technical details expected to be observed under the voluntary program—which the Committee on Interest and Dividends is administering—will be issued by November 15.

Dividends paid prior to January 1, 1972 remain subject to the President's request that dividends not be increased.

On November 15, 1971, detailed dividend guidelines were then issued by the Committee on Interest and Dividends. Relevant portions of these guidelines are set forth below:

1. *General Guideline.* Cash dividends on any class of common stock to be paid in 1972 should be declared at such rates that the aggregate annual payment per share (adjusted for stock splits and issuance of stock dividends) will not exceed by more than 4 percent the highest aggregate annual payment per share in any of the company's fiscal years ending in 1969, 1970, or 1971 (adjusted through December 31, 1971 for stock splits and issuance of stock dividends).

2. *Guideline adjustments.* (a) A company that paid no dividends on common stock in the years enumerated in Paragraph 1 or whose permissible dividend payments in 1972, under Paragraph 1, would aggregate less than 15 percent of net income (after taxes and dividends on preferred stock) in its fiscal year ending in 1971 may declare cash dividends on common stock at such rates that the aggregate dividends paid on common stock in 1972 will not exceed 15 percent of said 1971 net income.

\* \* \* \* \* \* \*

3. *Companies to which the Guidelines apply.* (a) Except as provided in Paragraph 3(b), these Guidelines apply to any company that (i) has more than $1,000,000 in total assets and a class of common stock held of record by 500 or more persons, and (ii) is subject to the reporting requirements of section 13 of the Securities Exchange Act of 1934 or is an insurance company with capital stock.

(b) These Guidelines do not apply to (i) a regulated investment company, a real estate investment trust, or personal holding company as defined in Subchapters M and G of the Internal Revenue Code, or (ii) a company 80 percent or more of whose common stock is owned by a company to which the Guidelines apply.

On November 15, 1971, the Committee on Interest and Dividends also issued a further statement, which contained the following language:

The "Guideline adjustment" provides for situations in which a company paid no dividends in the base years, or could pay out as dividends, in 1972, only a very small percentage of earnings on the basis of the General Guidelines. Such a company may pay dividends in 1972 totaling not more than 15 percent of its net income (after taking into account all taxes and dividends on preferred stock) in the company's prior fiscal year.

The Guideline limits on dividend payments are applicable to the year as a whole and not to each quarterly or semi-annual dividend payment. However, the Committee expects the corporations will not depart substantially from their previous patterns of dividend disbursements over the year. In any event, corporate dividend payments will be monitored throughout the year in order to ascertain whether the annual rate will conform to the Guidelines.

\* \* \* \* \* \* \*

*Coverage of the Guidelines.*

Broadly stated, the Guidelines cover almost all companies that are listed on any U.S. stock exchange, and unlisted companies that have 500 or more stockholders and over $1,000,000 in assets. With few exceptions, these are the corporations that are required to file financial reports under the Securities Exchange Act of 1934.

Although this coverage excludes a large number of small firms, and some with special characteristics, such as "Subchapter S" corporations and wholly owned subsidiaries, it includes almost 10,000 of the largest corporations, which account for all but a small portion of the dividends paid each year. *The Committee expects, however, that many small companies will comply with the spirit of the Guidelines.* [Emphasis added.]

\* \* \* \* \* \* \*

*Effective Date of the Guidelines.*

The Guidelines apply to dividends paid after December 31, 1971. For all corporations covered by the Guidelines, the freeze on dividend payments is extended through December 31, 1971.

On January 10, 1972, the respondent issued Rev. Proc. 72–11, 1972–1 I.R.B. 24, which purported to provide guidance to taxpayers seemingly caught between the upper and nether millstones of penalty taxes for not making payments and "guideline" violations for making them. Rev. Proc. 72–11 supersedes the earlier Rev. Proc. 71–34, 1971–2 C.B. 572, which had held that taxpayers with taxable years ended June 30, July 31, or August 31, 1971, would not be subjected to accumulated earnings tax for such year to the extent that their accumulations could not be distributed without violation of the September 4, 1971, "guidelines."

Rev. Proc. 72–11 provided in relevant part as follows:

SEC. 3. PROCEDURE.

.01 Where a corporate taxpayer with a taxable year ending on or after June 30, 1971, permits its earnings and profits to accumulate for that year, such

accumulations will not be subject to the accumulated earnings tax of section 531 of the Code *for that year,* to the extent that such accumulations could not be distributed as dividends to its shareholders without violating (1) the Cost of Living Council's dividend guidelines of September 4, 1971, issued under Executive Order 11615 dated August 15, 1971, or (2) the guidelines of November 15, 1971, issued by the Committee on Interest and Dividends under the authority of Executive Order 11627, dated October 15, 1971 whichever guidelines are applicable to dividends which could have been paid on the 15th day of the third month following the close of that taxable year for purposes of the dividends paid deduction referred to in section 563(a) of the Code.

.02 Where a corporate taxpayer, for a taxable year referred to in .01 above, that is exempt from the dividend guidelines permits its earnings and profits to accumulate for that year, in order to comply with the spirit of the dividend guidelines, such accumulations will not be subject to the accumulated earnings tax of section 531 of the Code *for that year,* to the extent that such accumulations could not be distributed as dividends to its shareholders without violating (1) the Cost of Living Council's dividend guidelines of September 4, 1971, issued under Executive Order 11615 dated August 15, 1971, or (2) the guidelines of November 15, 1971, issued by the Committee on Interest and Dividends under the authority of Executive Order 11627, dated October 15, 1971, whichever guidelines are applicable to dividends which could have been paid on the 15th day of the third month following the close of that taxable year for purposes of the dividends paid deduction referred to in section 563(a) of the Code, had the corporation not been exempt from such guidelines.

On December 21, 1971, the Committee on Interest and Dividends issued Questions and Answers on the 1972 Dividends Guidelines, including the following:

15. May a company be subject to the accumulated earnings tax of Section 531 of the Internal Revenue Code if it restricts its dividends because of the Guidelines?

No. The Internal Revenue Service has announced that the accumulated earnings tax will not be imposed to the extent that the accumulation resulted from a failure to distribute dividends in order to conform to the Guidelines.

On February 15, 1972, the Committee on Interest and Dividends increased the 15-percent limit for previous nondividend payers to 25 percent of after-tax income.

As of February 15, 1972, it was therefore clear that Shawnee would not be taxed for its taxable year ended April 30, 1972, on accumulations beyond the first 25 percent of its after-tax income for its taxable year ended April 30, 1971.

On April 3, 1972, 27 days before the end of Shawnee's taxable

year, respondent issued a sharply revised version of section 3 of Rev. Proc. 72–11, 1972–1 C.B. 732,[11] the portion of which directed to corporations like Shawnee which were exempt from the guidelines reads as follows:

SEC. 3. PROCEDURE.

.02 Where a corporate taxpayer, for a taxable year referred to in .01 above, that is exempt from the dividend guidelines permits its earnings and profits to accumulate for that year beyond the reasonable needs of the business, in order to comply with the spirit of the dividend guidelines, such excess accumulations will not be subject to the accumulated earnings tax of section 531 of the Code *for that taxable year* provided it distributes for that taxable year (including dividends that can be paid after the close of the taxable year under section 563 of the Code) the maximum amount that could have been paid as dividends to its shareholders for that year without exceeding: (1) the Cost of Living Council's dividend guidelines of September 4, 1971, issued under Executive Order 11615 dated August 15, 1971, or (2) the dividend guidelines that have been issued by the Committee on Interest and Dividends under the authority of Executive Order 11627, dated October 15, 1971, whichever guidelines are applicable and in effect on the last day of the corporation's taxable year. The phrase "in order to comply with the spirit of the dividend guidelines" is not intended to inject a subjective intent requirement test in the application of this subsection.

.03 The failure of a corporate taxpayer, referred to in .01 and .02 above, to pay as dividends, for a taxable year subject to the dividend guidelines, the maximum amount permitted by (1) the Cost of Living Council's dividend guidelines of September 4, 1971 issued under Executive Order 11615 dated August 15, 1971, or (2) the dividend guidelines that have been issued by the Committee on Interest and Dividends under the authority of Executive Order 11627, dated October 15, 1971, whichever guidelines are applicable and in effect on the last day of the corporation's taxable year will subject the entire accumulation less any dividends paid that are attributable to that taxable year to the accumulated earnings tax of section 531 of the Code.

Petitioner Shawnee Coal Co. paid no dividends out of its earnings in its April 30, 1972, year. Respondent, relying on the second version of Rev. Proc. 72–11, argues that petitioner may therefore. be taxed even upon accumulations during that year which could not have been distributed without violating the "spirit" of those guidelines, to which "many" small companies (their identities not being further described) were expected to adhere. An excess of compliance with one Government policy has thus ironically led to severe asserted penalties for violating a diametrically opposed policy: penalties which could have been avoided under Rev. Proc. 72–11 had Shawnee *increased* its

---

[11]Amplified by Rev. Proc. 72–42, 1972–2 C.B. 823, revoked in part by Rev. Proc 73–33, 1973–2 C.B. 489, modified by Rev. Proc. 74–7, 1974–1 C.B. 419, and superseding Rev. Proc. 71–34, 1971–2 C.B. 572.

dividends to the maximum allowable under the "spirit" of the guidelines.

During fiscal 1972, it was the policy of the Cost of Living Council to restrain dividends; it was and is respondent's policy to force their increase. Respondent has sought to harmonize the two inherently conflicting policies by agreeing to honor the policy of dividend restraint if and only if the taxpayer paid out *all* that the "spirit" of the guidelines allowed. The question before us is whether or not we should follow respondent in such restricted recognition of the guidelines. Phrased in the terms of the statute, the issue is whether we should recognize the existence in 1972 of a "reasonable need of the business" of a taxpayer which was exempt from the guidelines to accumulate earnings to the extent they could not have been paid out without violating the "spirit" of the guidelines. In view of the totality of the circumstances then existing, we conclude that such a "reasonable need" did exist, and therefore that, despite Rev. Proc. 72–11, no penalty tax may be assessed with respect to so much of petitioner Shawnee's accumulations as could not have been paid out within the "spirit" of the guidelines.

The imprecise and precatory nature of the final guidelines for dividend payments by small corporations makes our task difficult, as indeed it would have made it difficult for any taxpayer seeking to comply. The vague statement that "many" small corporations were "expected" to comply left no guide for a small corporation to know whether or not *it* was expected to comply. At the least, the pronouncement made it clear that the evidently strong public policy calling for "restraint" on dividend payments applied to "many" small corporations, and Shawnee was given no indication that it was *not* included. The applicability of the guidelines to small corporations was also indicated by Rev. Proc. 72–11, itself. Respondent, in this pronouncement, clearly exonerated accumulations by certain corporations exempt from the guidelines which would otherwise have been penalized, but did not spell out the statutory support found in the Internal Revenue Code for such exoneration. We discern two possible theories for such exoneration. The first theory would be that the existence of a subjective intent to comply with the

guidelines would supply a nontax motive for accumulating beyond reasonable business needs. Under section 533(a),[12] the fact of accumulation beyond reasonable business needs is determinative of the proscribed purpose to avoid tax, unless the corporation by the preponderance of the evidence shall prove to the contrary. Thus, a taxpayer could presumably be permitted to attempt to prove that the guidelines, and not tax avoidance, prompted his otherwise unreasonable accumulations. Such proof could rebut the presumption of section 533(a). It could also protect the taxpayer against a finding that he acted with the tax-avoidance purpose required for section 532 to apply. However, this theory would require a finding of taxpayer's subjective purpose. But Rev. Proc. 72–11, in its second version, says expressly that "the phrase 'in order to comply with the spirit of the dividend guidelines' is not intended to interject a subjective intent requirement test in the application of this subsection."[13] We are therefore relegated to the second theory, which is that the dividend guidelines, themselves, create a "reasonable need of the business." This theory, too, is not without its difficulties, one of which is that Rev. Proc. 72–11 itself refers to exoneration of accumulations *beyond* the reasonable needs of the business." However, we find no other statutory warrant for Rev. Proc. 72–11, and must therefore construe this language as referring to needs *other* than the need for dividend restraint under the "spirit" of the guidelines. We think the central question here is whether in 1972 there was a "reasonable need of the business" for Shawnee to comply with the "spirit of the guidelines." On this point, we are acutely aware of the fact that section 531 imposes a penalty tax. Elemental principles of fairness dictate that an executive branch, which so muddies the waters that it is impossible to tell

---

[12]Sec. 533(a) provides:

UNREASONABLE ACCUMULATION DETERMINATIVE OF PURPOSE.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

[13]Neither party raised the question of whether Shawnee was aware of the guidelines or had the subjective intent to accumulate to avoid violating the guidelines, and the record contains no direct evidence on these points. We note that the wage and price freeze and dividend freeze had great national television, newspaper and periodical news coverage, and it is inconceivable a business corporation through its executives, was unaware of its existence. Shawnee raised the guidelines as a defense as early as its sec. 534(c) statement.

what is expected of a corporation, should not be placed in a position to impose a penalty upon a corporate taxpayer to the extent the taxpayer did only that which was (or for all that appeared might well be) officially expected of it. If the Cost of Living Council had wanted to free small corporations from all dividend restraints, and to unleash respondent to force the payment of dividends, it could have said so. It did not, but left small corporations in a gray area. We can only conclude that during the relevant period, compliance with the spirit of the guidelines was a reasonable need of the business. We construe the language of Rev. Proc. 72–11, as well as the answer to Question 15 quoted above, as support for this proposition.

This being so, we cannot countenance the attempted restriction in Rev. Proc. 72–11 of exoneration from section 531 solely to corporations which *stepped up* their dividend payments to the maximum the spirit of the guidelines allowed. This restriction itself was inconsistent with the spirit of the guidelines, rewarding only the taxpayer who skirted to the very edge of the law, penalizing the taxpayer who went the extra mile, and putting each taxpayer on a razor's edge, where if he did not construe the guidelines with utmost precision and understanding, he would fall afoul of either the guidelines or the full penalty tax. The restriction seeks to allow the Government to have it both ways—to impose a penalty even for officially encouraged or demanded accumulations upon any taxpayer which accumulated even more. We are of the view that in the light of all the circumstances, including the repeated governmental demands for dividend restraint, the earlier public jawboning of offenders against nominally noncompulsory "guidelines," and the vagueness of the rules, it was beyond respondent's authority to punish the accumulation of so much as could not be distributed without violating the spirit of the guidelines.

Indeed, we do not read Rev. Proc. 72–11 as punishing the permitted accumulations. A taxpayer who limited itself to the permitted accumulations would not be punished. Instead, the punishment would fall only on the taxpayer whose accumulations exceeded the permissible guideline. The excess is therefore the object of the penalty. But the measure of the penalty tax sought to be imposed upon such a taxpayer would include not merely that portion of the accumulations which was not

justified, but also that portion which was justified. Under the statute, the penalty may be imposed only upon accumulations in excess of the reasonable needs of the business. If it is once accepted that accumulation to the extent of compliance with the guidelines was a reasonable and proper course for a corporation to follow (and Rev. Proc. 72–11 implicitly confirms that this is so), then a penalty upon the taxpayer who accumulates even more, based not upon the extent of the *excess* but upon the *entire* accumulation, is a penalty excessive in amount upon the impermissible portion of the accumulation. Having once conceded that a corporate taxpayer not expressly subject to the guidelines may not be penalized if it barely adheres to them, respondent may properly penalize only the excessive part of the accumulation, and that at only the statutory penalty tax rates. Respondent's actions here amount in effect to the application of an arbitrary penalty far in excess of the statutory rate upon that portion of Shawnee's accumulations which exceeded its reasonable business needs to comply with the dividend guidelines. We conclude that Shawnee was entitled to an accumulated earnings credit in the amount of accumulations required under the "spirit" of the guidelines as they existed at the end of Shawnee's fiscal year in issue.[14]

We must, accordingly, determine the maximum amount Shawnee could have paid out of its income for the year ended April 30, 1972, without violating the "spirit" of the guidelines. We find that payment of aggregate dividends in excess of 25 percent of 1971 after-tax reported taxable income would have violated the spirit of the guidelines. We construe the guideline "net income" to mean reported after-tax income, i.e., taxable income reported on the return ($254,965.56) less tax paid with the return (including estimated tax payments) ($116,852.26), in this case $138,113.30. Twenty-five percent of $138,113.30 is

---

[14]The relevant date may arguably be the last day dividends could have been paid and credited to that fiscal year, or 2 months and 15 days after the end of the year. Sec. 563(a). However, since there was no material change in the relevant guidelines between Apr. 30, 1972, and July 15, 1972, this is a matter we need not decide.

$34,528.33, and we hold that this constitutes accumulated taxable income, subject to the penalty tax under section 531.[15]

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

CHABOT, *J.,* concurring: I agree with the majority's analysis, but take this opportunity to emphasize one point that persuades me that the interpretation respondent gives the accumulated earnings tax provisions by his revised Rev. Proc. 72–11, 72–1 C.B. 732, issued on April 3, 1972, is inconsistent with the statute.

Rev. Proc. 72–11 provides that where a corporate taxpayer permits its earnings and profits to unreasonably accumulate for a year, these accumulations will not be subject to the accumulated earnings tax if the corporation distributes the *exact* maximum amount of dividends allowed by the Guidelines for Dividend Payments. Rev. Proc. 72–42, 1972–2 C.B. 823, provides that, if a corporation distributes more than the maximum permitted by the guidelines, then it can obtain the protection of Rev. Proc. 72–11 only by repayment of the excess dividends on or before a certain date as a contribution to capital. The effect of these two revenue procedures is that a corporation that distributes $1 less than the maximum amount permitted by the guidelines, or $1 more than the maximum amount permitted by the guidelines (unless the excess is repaid), will expose its entire accumulation for the year to the accumulated earnings tax. Thus respondent has created a "notch" whereby a corporation that miscalculates its dividend distribution by $1 for whatever reason may be liable for an accumulated earnings tax that could be very large in dollar amount. I believe that the statute does not provide, and that the Congress did not intend, that so extreme a sanction be imposed because a corporation did not distribute the exact maximum allowed by the guidelines but instead distributed some lesser or greater amount no matter how small the variance.

Section 531 of the Internal Revenue Code of 1954 imposes the accumulated earnings tax on "accumulated taxable income." In general, section 535 of the Code defines "accumulated taxable

---

[15]It seems clear that the reasonable need to accumulate to meet the guidelines is a need only to the extent it exceeds other reasonable business needs, so that the $18,112.48 which respondent allowed as a sec. 535(c) credit is subsumed within, and is not in addition to the amount of the credit we have determined here.

income" as taxable income with certain adjustments less the accumulated earnings credit under section 535(c) of the Code for earnings and profits retained for the reasonable needs of the business[1] and less the dividends paid deduction under section 561 of the Code. Thus, under this statutory scheme, each additional $1 of taxable income (or $1 of adjustments, or $1 of reasonable needs of the business, etc.) changes by only $1 the base for the accumulated earnings tax.

Respondent's revenue procedures have the effect that if a corporation does not distribute the exact amount that could be distributed under the guidelines, the portion of the accumulation that would otherwise be considered as having been retained for the reasonable needs of the business (by virtue of the guidelines) becomes subject to the tax. This result is inconsistent with the accumulated earnings credit provisions which provide a credit for earnings and profits retained for reasonable needs of the business.

Thus, the "notch" concept that respondent has created through his revenue procedures is clearly at odds with the statutory scheme and should not be given effect.

IRWIN, *J.*, dissenting: I dissent from that part of the decision

---

[1] The 1939 Code provided no credit or exclusion with respect to the accumulated earnings tax so that, if a corporation were held to be subject to the tax, then its entire undistributed net income (with minor adjustments) was subject to the tax. In enacting the Internal Revenue Code of 1954, the Congress, to alleviate this situation, provided for a credit for the profits of the taxable year which are retained for the reasonable needs of the business.

The Senate Finance Committee report (S. Rept. 83–1622, to accompany H.R. 8300 (Pub. L. 83–591), p. 72 (1954)) described the purpose of the provision as follows:

*(2) Changes made by committee*

Your committee has substantially revised the accumulated earnings credit provided by the House bill. It has provided a credit for the profits of the taxable year which are retained for the reasonable needs of the business and provided that in no case is this credit to be less than the amount by which $60,000 exceeds the accumulated profits of the corporation as of the end of the prior year. This in effect provides two changes in present law. In the future this tax will apply only to the amount unreasonably accumulated. Moreover, in no case will the tax be imposed on any corporation which has not accumulated earnings to the extent of $60,000. However, earnings may, of course, be accumulated in excess of $60,000 where the accumulation is for the reasonable needs of the business.

Your committee has provided that this tax is to be imposed only on the amount unreasonably accumulated because it sees no justification for imposing a penalty tax on accumulated earnings to the extent that the earnings were needed in the business. It is believed that it is this aspect of the tax which taxpayers generally find particularly alarming, because, while they may be confident that they can justify the accumulation of most of their earnings, they may feel less certain about a minor portion of their accumulations and fear that this will subject their entire accumulated earnings to tax.

This Senate amendment (No. 125) was agreed to by the House of Representatives without change (H. Conf. Rept. 83–2543, to accompany H.R. 8300 (Pub. L. 83–591), pp. 1, 49–50 (1954)) and now appears as sec. 535(c)(1) of the Code.

which holds that Shawnee is subject to the accumulated earnings tax only on the excess of its taxable income that could have been paid without violating the spirit of the Wage and Price Guidelines.

As is clear, the purpose of Rev. Proc. 72–11, 1972–1 C.B. 732,[1] was to mesh the President's economic stabilization program with the accumulated earnings tax and to encourage corporations to comply with the dividend guidelines issued by the Committee on Interest and Dividends. In the absence of these guidelines, a corporation which did not distribute any after-tax income, assuming it had no reasonable business needs for which this amount was to be used, would be presumed under section 533(a)[2] to have the proscribed purpose. All of the after-tax income would then be subject to the accumulated earnings tax unless it could show by a preponderance of the evidence that it did not have the proscribed purpose. Sec. 532(a).[3] The guidelines, however, provided that certain corporations could not distribute more than 25 percent of net income without violating the law.

Rev. Proc. 72–11 held that where a corporate taxpayer exempt from the dividend guidelines (as is petitioner herein) permitted its earnings and profits to accumulate beyond its reasonable business needs, in order to comply with the spirit of the dividend guidelines, it would not, nonetheless, be subject to the accumulated earnings tax provided that it distributed the maximum amount that could have been paid as dividends to its shareholders without exceeding the dividend guidelines (that is, it distributed exactly 25 percent of its after-tax income). Failure to meet the test would subject the corporation's entire earnings to the accumulated earnings tax.

The majority sets forth two theories under which statutory authority for the Rev. Proc. may be found. The first theory is that the existence of a subjective intent to comply with the

---

[1] The Rev. Proc. is set forth in full in all its relevant parts in the majority opinion.

[2] SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) UNREASONABLE ACCUMULATION DETERMINATIVE OF PURPOSE.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

[3] SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) GENERAL RULE.—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

guidelines supplies a nontax motive for accumulating beyond reasonable business needs. The majority states that the Rev. Proc. rejects this theory, however, by reading the phrase "not intended to interject a subjective intent" as meaning that respondent has determined that he will not consider a taxpayer's subjective intent to meet the guidelines as excusing nondistribution of earnings in any case in which the 25-percent test is not precisely met.

I believe the majority misinterprets the scope of the Rev. Proc. I read the Rev. Proc. to mean only that if a taxpayer has met the objective test set forth therein, then for administrative purposes, respondent has determined that he will not challenge whether the taxpayer's intent was to withhold distributing its earnings to meet the guidelines rather than the proscribed purpose of section 532(a); thus, the Rev. Proc., in effect, created a safe harbor. If a corporation failed to meet the test, I believe respondent intended to allow it to prove by a preponderance of the evidence that it did not have the proscribed purpose. Sec. 533(a).

Indeed, such a result is required under the statute. As this Court stated in *Atlantic Properties, Inc. v. Commissioner*, 62 T.C. 644, 659–660 (1974), affd. 519 F.2d 1233 (1st Cir. 1975):

A corporation should not be liable for the accumulated earnings tax if it accumulates for reasons other than the forbidden purpose of section 532(a) even though earnings may have been accumulated out of caprice, spite, miserliness, or stupidity rather than for sound business reasons.

Under the wording of the statute as interpreted by *Atlantic Properties, Inc. v. Commissioner, supra,* it is clear that if a taxpayer can show that its intent in accumulating earnings beyond its reasonable needs was to adhere to the spirit of the guidelines rather than to avoid the income tax with respect to its shareholders on the undistributed amounts, the accumulated earnings tax would not apply. This would be true even if respondent had never issued Rev. Proc. 72–11. I believe that it is unreasonable to interpret the Rev. Proc. so as to deny a taxpayer this opportunity.[4] On the other hand, I believe it is unreasonable to interpret it to give an outright blanket credit to a taxpayer

---

[4]I do not read the majority opinion as necessarily foreclosing an argument by a taxpayer who has distributed less than the maximum amount allowed under the Wage and Price Guidelines that its subjective intent was not to avoid the income tax on its shareholders but rather to comply with the spirit of the guidelines.

during the period covered by the guidelines as the majority does under its second theory (which is discussed later).

Once it has been established that the Rev. Proc. created an objective test or safe harbor under which a taxpayer's intent would not be challenged, it does not appear to be arbitrary to challenge Shawnee's intent and subject the entire accumulation to the accumulated earnings tax since it did not meet the test. This is so because none of Shawnee's accumulations were retained to provide for its reasonable business needs. Thus, although I agree with the majority's conclusion that it would be beyond respondent's authority to "punish" accumulations in all cases in which the objective test set forth in the Rev. Proc. was not met, regardless of the taxpayer's intent to comply with the spirit of the guidelines, I do not believe respondent has attempted to do so.

In the case at bar, no evidence was found by the majority which indicates that Shawnee had any intent to meet the objective test but failed to do so, or, for that matter, whether it was aware of the guidelines as of July 15, 1972,[5] the time it accumulated the earnings.[6] Nor was there any evidence in the record that suggests Shawnee intended to distribute less than allowed under the guidelines for any reason other than the proscribed purpose. At the least, Shawnee has not shown that tax avoidance was not one of the purposes for accumulating earnings. *United States v. Donruss Co.*, 393 U.S. 297 (1969). This necessarily follows from the majority's holding that Shawnee was entitled to a credit only to the extent of its earnings required to be retained under the "spirit" of the guidelines: If Shawnee had either the intent to meet the objective test but failed to do so (for example, because of a mathematical error or inability to accurately determine the amount of its taxable income) or the intent to otherwise meet the spirit of the guidelines, the entire accumulation would be free under section 533(a) from the accumulated earnings tax rather than only the amount required to be distributed. This is so because Shawnee would not have had the proscribed intent with respect to any of the accumulations.

---

[5]Shawnee's fiscal year ended on Apr. 30, 1972. Under sec. 563(a), it had until July 15, 1972, to distribute dividends without being subject to the accumulated earnings tax.

[6]The only statements ever made by any representatives of Shawnee with respect to the guidelines are in the sec. 534(c) statement, petition, and reply brief. These, of course, do not constitute evidence.

The majority states that the second theory upon which statutory authority for the issuance of the Rev. Proc. may be found is that compliance with the spirit of the guidelines is a reasonable need of the business entitling it to the credit provided in section 535(c)(1) for reasonable business needs. The majority holds that the dividend guidelines themselves created a reasonable need of the business, a result they reach although it "is not without its difficulties."

One difficulty noted by the majority is that the Rev. Proc. states that a corporate taxpayer is not subject to the accumulated earnings tax where it "permits its earnings and profits to accumulate * * * *beyond the reasonable needs of the business*, in order to comply with the spirit of the dividend guidelines." (Emphasis added.) I believe this language quite clearly indicates that the Rev. Proc. did not establish compliance with the spirit of the guidelines as a reasonable business need but rather was intended as a matter of administrative convenience to inform taxpayers that respondent would not question accumulations if they fell within the guidelines. Moreover, this language supports my position that the Rev. Proc. established an objective test under which respondent presumed (conclusively) that if the test was met, the reason for the accumulation beyond reasonable business needs was not the proscribed intent but rather was in order to comply with the spirit of the guidelines.

The majority, however, in rejecting the "intent" theory no longer finds any statutory authority for the Rev. Proc. and concludes that the language must mean "needs *other* than the need for dividend restraint under the 'spirit' of the guidelines." Not only is this a strained reading of the language of the Rev. Proc., it is unnecessary if the Rev. Proc. is viewed as creating a safe harbor under which respondent would not challenge intent. Respondent certainly has authority to establish administrative quidelines under which he will not challenge a taxpayer's intent.

Although the Rev. Proc. itself does not provide support for the majority's position that compliance with the guidelines is a reasonable need, it nevertheless appears that the majority would reach the same result on the basis of the repeated governmental demands for dividend restraint, earlier public jawboning of ·offenders, and vagueness of the rules. But in order to obtain the benefit of the credit for reasonable business needs provided for in section 535(c)(1), it seems to me that a taxpayer must not only

establish that, in fact, it had a reasonable business need for which it should have retained its earnings at the time of accumulation but also that it actually retained its funds to meet the need. That section states that the accumulated earnings credit is "an amount equal to such part of the earnings and profits for the taxable year *as are retained* for the reasonable needs of the business." (Emphasis added.) In other words, a taxpayer must retain the funds to provide for those needs.[7] If a corporation was not aware of the need at the time of accumulation (which is the case here), it could not in any event have retained those funds for that need.[8]

As already pointed out, the majority found no direct evidence on whether Shawnee was aware of the guidelines or had the subjective intent to comply with the spirit of the guidelines. In fact, neither party raised the issue. There was no testimony, corporate record, or resolution which would support the majority's finding that Shawnee was aware of the guidelines and retained its earnings to comply with the spirit of the guidelines. The majority, therefore, gratuitously considers Shawnee to have been not only aware of the guidelines but also to have retained its earnings in order to comply with them[9] because "it is

[7] In *John P. Scripps Newspapers v. Commissioner*, 44 T.C. 453 (1965), we held that in view of the credit provided for in sec. 535(c)(1), it was not necessary for the taxpayer to show it was not availed of for the proscribed purpose, for even if it was so availed, it would be entitled to a credit equal to the amount of earnings which it had retained for its reasonable business needs. I believe that result is correct. We found that the corporation's officers and directors retained earnings after considering the needs of the business for expansion, meeting competition, etc.; therefore, the corporation both recognized its needs and retained its earnings to provide for them. See also *Bremerton Sun Publishing Co. v. Commissioner*, 44 T.C. 566, 583 (1965).

[8] The difference between a taxpayer attempting to prove that its intent was not the proscribed purpose, assuming that accumulating to comply with the spirit of the guidelines was not a reasonable business need, and attempting to show it retained its earnings to adhere to the guidelines, if such was a reasonable business need, may determine the outcome of the case. Under *United States v. Donruss Co.*, 393 U.S. 297 (1969), the taxpayer must show that tax avoidance was not one of its purposes for accumulating earnings. Therefore, if a taxpayer failed to distribute its earnings because it wanted not only to comply with the spirit of the guidelines (assuming not a reasonable business need) but also for the proscribed purpose, the accumulated earnings tax would apply. But if a taxpayer retained its funds to adhere to the spirit of the guidelines (assuming to do so was a reasonable business need), under our decision in *Scripps Newspapers v. Commissioner, supra* (see n. 7), no further inquiry need be made to determine whether the taxpayer had the additional motive to avoid the income tax with respect to its shareholders.

[9] At least this is the result in those situations in which the taxpayer has distributed less than the maximum amount that could have been paid as dividends to its shareholders without exceeding the guidelines. The majority has not, in its opinion, addressed the situation where a taxpayer has distributed more than the maximum amount that could have been distributed. It is unstated, therefore, whether it would also hold Rev. Proc. 72–42, 1972–2 C.B. 823, dealing with the latter situation, arbitrary. At the least, different policy considerations would apply in the case of distributing more than the Wage and Price Guidelines permitted. No longer could penalties be .

inconceivable a business corporation through its executives was unaware of its existence."

It appears that the majority has, in effect, therefore, taken judicial notice that a corporation, through its executives, was aware of the guidelines because of their great national television, newspaper, and periodical news coverage. To me, this is an unwarranted use of judicial notice, particularly in the case of a small, closely held corporation. Since the burden of proof is on Shawnee, the result in this case would appear to be dictated by petitioner's failure to establish that it was even aware of the guidelines. Accordingly, I would hold that Shawnee is not entitled to any credit for reasonable business needs.[10]

---

avoided by increasing dividends, a policy opposed by the guidelines; rather, the distribution of earnings in excess of the guidelines would, obviously, not be in compliance with the guidelines policy. Moreover, a taxpayer who distributed more than the maximum amount could avoid the accumulated earnings tax if all of its shareholders returned (within certain time limits), pro rata, those dividends distributed in excess of the amount permitted. Rev. Proc. 72–42.

[10]Indeed, Shawnee's record of never having distributed dividends in the past indicates that it is by happenstance alone that Shawnee complied with the spirit of the guidelines. Where a taxpayer was unaware of the guidelines, it would be unnecessary to protect it from being caught between the guidelines and the accumulated earnings tax. Nor is it clear that a mere awareness of the guidelines, without more, would be sufficient to support a finding that Shawnee retained its earnings to meet the guidelines. For example, there are no corporate records or testimony which indicate that Shawnee would have distributed its earnings except for the guidelines. In this regard, outside of the petition and sec. 534(c) statement, no mention of the dividend guidelines was made until reply brief. On original brief, Shawnee maintained that it could not distribute its earnings only because it needed the funds for expansion into the real estate business. It does not appear to me that Shawnee could have refrained from distributing its accumulated earnings to comply with the spirit of the guidelines unless it was aware that it had any earnings to distribute. Therefore, the majority gives Shawnee a credit to provide for its compliance with the spirit of the guidelines although Shawnee contends that it retained its funds for expansion into the real estate business, thus apparently unaware that it had any earnings available for distribution. Cf. *Capital Sales, Inc. v. Commissioner*, 71 T.C. 416 (1978).